PITMAN, J.
| ¶ Defendant Dveil Deshon Freeman appeals his convictions and sentences for second degree murder and seven drug offenses. For the following reasons, we affirm.
FACTS
Beginning in 2008, Louisiana,State Police (“LSP”) began investigating Defendant for drug trafficking offenses, along with his co-conspirators Ivory Mock (aka Deek), David Green (aka Goose), Anthony Glosson (aka Ant), and Curtis Brown (aka Slew Foot). A conspiracy case was made against Mock and a distribution case was made against Green. In November 2009, Trp. Shelton Crooks approached Green about cooperating against Defendant. Although Green initially agreed to cooperate, he later called Trp. Crooks and advised that he would not; Trp. Crooks believed that call was instigated by Defendant.
Mock began assisting police in the investigation; and, in February 2010, several weeks before the instant drug arrest of Defendant, Trp. Crooks received information from Mock that Defendant would be receiving a drug shipment from Houston, Texas, via a tanker truck at the' E-Z Mart in Monroe, Louisiana, near the intersection of La. Hwy. 594 and 1-20. Trp. Crooks and other officers began physical surveillance of Defendant in and around locations he was known to frequent, i.e., Presidential Estates and Love Estates. These two neighborhoods are located off Hwy. 594, north of the E-Z Mart. The operation was botched, however, when Defendant discovered the surveillance.
1?,Subsequently, at approximately noon on March 17, "2010, Mock called Trp. Crooks and’ advised that Defendant was going to receive another shipment of drugs, via a tanker truck, at the E-Z Mart that , night. Trp. Crooks began 'planning an operation to set up surveillance at the E-Z Mart. Traveling .iri an unmarked unit, Trp. Crooks took his new supervisor, Sergeant Neal Harwell, into Presidential and Love Estates for him to “get a feel” for the area.
Shortly thereafter, Mock called Trp. Crooks, and advised that Defendant was aware that police officers had been in Presidential and Love Estates and that Defendant,had asked him to rent a car for him. Mock advised that he had rented a white Ford Explorer, as sole lessee, for Defendant and suggested that Trp. Crooks meet him and place a GPS tracking device on the car. Trp. Crooks and Sgt. Harwell met Mock at Lexington Elementary School around 5:30 p.m. Without first obtaining a warrant, Trp. Crooks affixed the GPS device to the frame of the. .Ford Explorer with a magnet. .
At 6:00 p.m., Trp. Crooks and Sgt. Har-well met with other officers at LSP Headquarters; Troop F, located on Hwy. 594, to discuss the operation. Among those involved were LSP Trps. Chris Jordan, Harry Randall Lowery, Steve Wallace and Michael Reichardt, along with Sheriff Jerry Philley, Dep. Kenneth Green and Dep. Victor Smith from the West Carroll Parish Sheriffs Office. ..After the meeting at around 6:30 p.m., the officers set up in locations around the E-Z Mart and were all in radio contact with each other.
IsTrp. Jordan set up surveillance in an unmarked truck in the parking lot of the *6 E-Z Mart. He possessed the only device, a laptop computer, to monitor the GPS de-' vice placed on the Ford Explorer, and he relayed to the other officers over the radio the Explorer’s movements on public roadways throughout the evening. Trp. Crooks, Trp. Lowery, Trp. Reichardt and Dep. Smith set up surveillance in the parking lot of Ouachita High School, located on Hwy. 594 just north of the E-Z Mart. Trp. Wallace and Dep. Green' set up surveillance at the intersection of Hwy. 594 and Hwy. 80, north of the É-Z Mart near Presidential and Love Estates. Sgt. Har-well and Sheriff Philley drove around the area of Hwy. 594 and 1-20.
At some point that evening, Defendant obtained the keys to the Ford Explorer from Green, who had received the' keys from Mock. Around 2:00 a.m., Trp. Wallace alerted the other officers by radio that he observed the Explorer traveling south on Hwy. 594 toward the E-Z Mart. Officers at the high school observed the Explorer going by the high school. Trp. Jordan then observed the Explorer enter the E-Z Mart parking lot and pull up to the front door of the store. After he confirmed with the GPS that the Explorer he saw was the correct Explorer, Trp. Jordan stopped monitoring the GPS. The Explorer was driven to the back of the parking lot and parked next to Trp. Jordan, who then confirmed that Defendant was driving the Explorer. ■ .. -
Meanwhile, Sgt. Harwell 'radioed that he observed a tanker truck exiting 1-20 and heading north on Hwy. 594 toward the E-Z Mart. Trp. Jordan observed the tanker truck pull into the back area of the E-Z |4Mart parking lot and saw Defendant drive up next'to the tanker truck. The driver of the tanker, later identified as Ricky Freeman, Defendant’s uncle, exited the tanker with a large, dark-colored luggage bag and approached the driver’s side of the Explorer. About 30 seconds later, Ricky returned to the tanker without the bag. Defendant then drove the Explorer out of the E-Z Mart parking lot and headed north on Hwy. 594. Trp. Jordan conveyed the information via radio to the other officers that the transaction had occurred.[1]
When Defendant drove past Ouachita High School, Trp. Lowery began following him in a marked unit. He paced the Explorer and determined that Defendant was traveling 60 mph in a 55 mph zone. When he attempted to stop Defendant, Defendant accélerated away, reaching speeds over 80 mph. At some point in the chase, Trp. Lowery believed that something was thrown out of the window of the Explorer. Defendant continued traveling north on Hwy. 594 through the intersection at Hwy. 80, moving into the opposing lane to avoid hitting another car. Defendant sped past the entrance of Love Estates; in an apparent attempt to turn onto a dirt road leading into Love Estates, his vehicle left the roadway, went through a ditch and crashed into a tree.
Defendant then exited the Explorer and began running east, toward Love Estates. Trp. Lowery pursued him on foot. Defendant fell; and, as Trp.' Lowery was trying to restrain him, Defendant escaped and continued running. Trp. Lowery chased Defendant; and, when Defendant fell again, Trp. Lowery sprayed him with pepper spray, getting some in his own eyes. 15As Defendant began to flee again, Trp. Crooks, Trp. Reichardt and Dep. Smith arrived and were able to apprehend him. *7 Trp. Crooks advised Defendant of his Miranda rights. The officers began the decontamination process of the pepper spray by spraying Defendant’s face with a bottle of water.
Through the passenger-side window of the Explorer, Trp. Lowery and Trp. Crooks observed a blue plastic bag containing four packages of suspected cocaine along with numerous pills (green and yellow capsules and pink and white capsules) scattered on the passenger-side floorboard. The interior lights of the Explorer were on. Around this time, Defendant told the officers that he would show them where he had thrown some drugs out of the car window during the chase. As they were walking, Defendant started running .toward Love Estates, but was again apprehended. Officers seized $5,658 and five cell phones from him.
After he was arrested and transported to LSP Headquarters, Troop F, Defendant was allowed to clean himself up in a bathroom. Sgt. Harwell advised him of his Miranda rights. Defendant then gave a statement to Trp. Crooks. During the interview, Defendant stated that, on March 16, 2010, he received $24,000 from Glosson for one of the kilos of cocaine and delivered the money to Ricky that same date. Defendant also stated that Mock told him to pick up the package and that he was being paid $2,000 from Mock and $2,000 from Glosson.
Defendant was then transported to Oua-chita Correctional Center (“OCC”). The next day, Cameron Murray, his attorney, contacted |BSgt. Harwell and advised that Defendant wanted to talk to investigators. Sgt. Harwell, Trp. Crooks, and FBI Agent Tim Stephens visited Defendant at the OCC. Mr. Murray advised Defendant of his rights. During the interview, Defendant stated that his supply source was two black males from Houston, named “Fat Boy” and “Little Dude,” and that they distribute around 20. to '30 kilos of cocaine per week and were connected to a Colombian individual. Defendant further stated that the largest transaction he had ever done was $200,000 for 10 kilos of cocaine. Defendant also stated, that the pills were supposed to be Ecstasy. There were no promises made to Defendant and no discussions concerning his bail. After the interview, the officers told Defendant to contact them if he wanted to cooperate further. Mr. Murray asked for Trp. Crooks’ phone number, and Trp. Crooks responded that Defendant knew his number. Trp. Crooks recited the first three numbers, and Defendant responded accurately with the last four digits. Defendant stated that Green had given him Trp. Crooks’ phone number, confirming Trp. Crooks’ belief that Defendant had been listening in on the phone call when Green called and told him that he did not want to be a confidential informant.
While at OCC, Defendant called a friend and discussed his belief that Green was the person who had informed law enforcement that the drug deal was to take place at the E-Z Mart. Defendant made bail and was released on March 19,2010.
|70n March 28, 2010, Green was murdered in his apartment by a single shot to the head. Several witnesses placed Defendant near Green’s apartment, and he surrendered to police.
In federal court, Defendant pled guilty to one count of conspiracy to distribute the cocaine that was seized on March 18, 2010.
On May 13, 2010, Defendant was charged by bill of indictment with the following offenses: (1) second degree murder of David Green; (2) possession of cocaine with intent to distribute; (3) possession of N-benzylpiperzine (“BZP”) with intent to distribute; (4) possession of 400 grams or *8 more of cocaine; (5) conspiracy to distribute a Schedule I- CDS; (6) conspiracy to distribute a Schedule II CDS; (7) conspiracy to commit transactions involving proceeds from drug offense; and (8) transactions involving proceeds from'drug offense.
On July 7, 2010, Defendant filed a motion to suppress, seeking to suppress all physical evidence seized as a result of the warrantless search of the white Explorer on March 18, 2010, and all statements given by Defendant to law enforcement concerning such evidence. In opposition, the state argued that the officers had probable cause to stop Defendant’s vehicle, that the narcotics seized were observed in plain view and that all of Defendant’s statements were admissible.
On January 30, 2012, Defendant filed a supplemental motion to suppress, based on the recent U.S. Supreme Court case of United States v. Jones, — U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), wherein the Court held that the attachment of a GPS device to a vehicle and the | «subsequent .monitoring of the vehicle’s movements on public streets is a search within the meaning of the Fourth Amendment. In opposition, the state argued that Defendant did not have standing to challenge the placement or monitoring of the GPS device because he was not in lawful possession of the rental vehicle that was leased to Mock and delivered to him by Green. The state also claimed that all of the evidence seized would have been inevitably discovered without resort to the GPS monitoring; that United States v. Jones, supra, is inapplicable as it was decided after- the search in this case; and that the officers were entitled to rely in good faith on then-current precedent.
' Defendant also ■ filed an amended and supplemental motion to suppress, seeking to prohibit .introduction of evidence regarding his federal guilty plea, including a signed factual statement.
The trial court held hearings on the motion to suppress on January 31, 2012, February 1, 2, 3, 6, 7, 9, 10 and 14, 2012. Trp. Lowery, Trp. Jordan, Trp. Crooks, Sgt. Harwell and Dep. Green testified as to the investigation, surveillance and ap--prehension of Defendant, as set forth above.
Trp. Lowery identified photographs of the Ford Explorer, the drugs1 as they were found in the car and the video from his dash camera depicting his pursuit of the Explorer, all of which was admitted into evidence. He stated that it was his understanding that a narcotics transaction had occurred, that hé was instructed to stop the vehicle whether or not there was a traffic infraction, and that he was not interested in stopping 'any other vehicles that night. He also stated that Defendant was arrested for speeding, improper | Jane usage, possession with intent to distribute cocaine, possession with intent - to distribute the pills, resisting by flight and simple escape.
Trp. Jordan testified that he was live-tracking the GPS device on the Ford Explorer and that they were using the GPS because they did not want to physically monitor Defendant’s locations and risk “getting burned” like before. He stated that the GPS device was monitored from the time it was attached to the Explorer, which helped them learn where the vehicle was located all day and confirmed that the vehicle was arriving at the E-Z Mart. Regarding the actual transaction, he testified that he did not actually observe Ricky hand the bag- to Defendant, but assumed that the transaction had occurred because he saw Ricky go to the driver’s side of the Explorer with the bag, and return to the tanker without the bag. The security video from the E-Z Mart was admitted into *9 evidence. The video shows the Explorer pulling up next to the tanker, but- does not depict Ricky exiting the tanker-, or the alleged transaction.
Trp. Crooks testified that he placed the GPS device on the Explorer with Mock’s consent and that Mock was aware that a GPS device was being attached. He stated that, when they arrived at Lexington Elementary, Sgt. Harwell talked to Mock while he slipped under the vehicle and attached the GPS device.. He further stated that he never told Mock that he placed anything on the Explorer; and there was no discussion regarding a GPS device at the school, but Mock knew he went under the Explorer. He stated that his intent was to conceal the attachment of the GPS on the Explorer from Mock and whoever else used the vehicle», He testified that Trp. Jordan | ,ngave GPS updates throughout the day, but their plan was to maintain surveillance at the E-Z Mart regardless of where the Explorer went because Mock never told him what vehicle Defendant would use for the delivéry. Defendant could have shown up in any other vehicle. He stated that Trp. Lowery was instructed to establish probable cause and initiate a traffic stop of Defendant if the transaction occurred. Their plan was to make it appear like a traffic stop to protect the identity of the informant.
Sgt. Harwell testified that he talked to Mock while Trp. Crooks installed the GPS device on the Explorer. He did not know if Mock knew the GPS was attached to the underside of the car, but it was his understanding that the use of the GPS was Mock’s idea. He stated that they used the GPS to ascertain when Defendant was coming to the E-Z Mart. Their plan was to stay at the E-Z Mart regardless of where the car traveled. He,further stated that it was predetermined that Trp. Lowery would stop Defendant’s vehicle once it left the E-Z Mart. He also- testified that Mock was never a confidential informant, that he had never met Mock before and that he did not believe Mock was reliable since he did not know of anything Mock had done to bejudged reliable.
William Davis Hardy, Jr., the owner of the Hertz Rental Corporation franchise in Monroe, Louisiana, testified that Mock rented the Ford Explorer from Hertz at 5:06 p.m. on March 17, 2010, and that Mock was the only person with authority to drive the vehicle. He stated that he never gave permission to any law enforcement officer or Mock to attach a GPS device on the rented vehicle. He further stated that Hertz' would allow renters to |uattach or use GPS devices, as long as there was no permanent modification to the vehicle. ■
Defendant testified that he got the Explorer from Green around 9:00 p.m. He admitted that he asked Mock to get him a rental car and that Mock gave the car to Green, who then brought it to him. He also testified' that he spoke with officers on March 19, 2010, while he was at OCC, because he was told that his bond would be reduced if he cooperated.
Mr. Murray, Defendant’s prior attorney, testified that Defendant had a hearing on March 19, 2010, for the purpose of adjusting his bail.
Mock was called to testify, but invoked his Fifth Amendment right, refusing to confirm the allegations regarding the rental vehicle and the placement of the GPS on the vehicle.
On November 14, 2012, Defendant filed a motion to reopen suppression evidence, claiming that he had received new evidence, i.e., an audio recording of the radio communications between the officers during their surveillance of him. Based on these recordings, he claimed that further *10 examination of the officers was necessary to determine the extent to which the GPS device was used and relied on by them.
The trial court held hearings on the matter on March 5 and 28, 2013. The audio recording of the radio communications was admitted into evidence. Sgt. Harwell and Trp. Crooks testified that their plan was to stay at the E-Z Mart regardless of where the GPS indicated the Explorer traveled. Trp. Crooks stated that they used the GPS as a tool to determine the Explorer’s location and when it was approaching the E-Z Mart. | i2Sgt. Harwell stated that, during their surveillance, Trp. Jordan was giving a play-byplay of the location of the Explorer based on the GPS. Trp. Jordan’s testimony confirmed that fact. Trp. Jordan stated that, despite his comments on the audio recording asking if “they were just going to sit there,” the plan was to stay at the E-Z Mart.
On October 8, 2013, the trial court signed a judgment denying Defendant’s motion to suppress, without providing any reasons. Defendant filed an application for supervisory writs with this court, which was denied on the basis that Defendant had an adequate remedy by review on appeal. See No. 49,187-KW.
The jury trial began on March 12, 2014. The following facts were gleaned from the witnesses’ testimony:
Trp. Crooks testified regarding the investigation and surveillance of Defendant on March 17, 2010, and as to Defendant’s statements, as detailed above.
Trp. Wallace testified as to the surveillance of Defendant on March 17, 2010, as set forth above. He stated that, after the Explorer was towed from the crash scene to LSP Headquarters, Troop F, he observed and secured the narcotics that were located on its front passenger floorboard— approximately nine pounds of cocaine and 1,175 capsules.
Trp. Lowery testified as -to 'the traffic stop and apprehension of Defendant on March 17, 2010, as detailed above. The video from his dashboard camera was played for the jury.
| iaTrp. Reichardt testified as to the March 17, 2010 surveillance arid arrest of Defendant, as set forth above. He also identified the photographs he took of the Explorer at the crash site, photographs of the narcotics on the passenger-side floorboard of the Explorer and photographs of the tanker truck. Regarding the narcotics, the photographs show that there was a blue, plastic shopping bag from Wet Seal on the passenger-side floorboard, with four plastic-wrapped bundles sticking out of it; a clear, opened Ziploc bag of capsules in the console; and numerous capsules scattered around the blue bag.
Trp. Jordan testified regarding his surveillance of Defendant and the transaction that he observed at the E-Z Mart on March 17, 2010, as described above. The E-Z Mart security video was played for the jury.
Latisha Freeman, Defendant’s cousin, testified that she leased the apartment that the murder victim, Green, was living in at the time of his death. She stated that, when she moved out of the apartment in 2008, she allowed Green to move in at the suggestion of Defendant.
Leola Summerville, a forensic scientist at the North Louisiana Crime Lab, testified that she determined that the white substance in each of the four plastic-wrapped bundles was cocaine, a Schedule II CDS, and that the total weight of the packages was 3,954.4 grams, with each package being approximately a kilo. She stated that the capsules were determined to be BZP, a Schedule I CDS.
*11 Dep. Donna Whitton, of the Ouachita Parish Sheriffs Office, testified regarding the phone system available to inmates at OCC. She stated that all 114calls are monitored and recorded. The call that Defendant made from jail on March 19, 2010, at 10:57 a.m., was played for the jury. On the recording, Defendant accused Green of being the snitch, and stated, “why he break me like that,” he “f* * * *d my life up like that,” “I know he did it” and “he is only person that knew about it.” In the call, Defendant also talked about the incident with him knowing Trp. Crooks’ phone number and stated that Green gave him Trp. Crooks’ number.
Sgt. Harwell testified regarding his involvement in the surveillance and investigation of Defendant on March 17, 2010, as set forth above. •
Officer Stephen Snowberger of the Monroe Police Department testified that, on March 28, 2010, he was. dispatched to the Hilco Apartments, located at 303 Kenil-worth, in Monroe, Louisiana, shortly after 10:00 p.m., and was the first officer to arrive at the scene. The doorway to the victim’s apartment, which was .on the lower level and at the end of the building, was open, and the victim was lying face down and nonresponsive inside the doorway. After talking to several witnesses, Ofc. Snowberger provided a description of two suspects to other officers via radio — a black male in a yellow shirt and a black male wearing all black.
Richard Jones, who worked for the Monroe Police Department" in 2010 (now retired), identified photographs that he took of the areas in and around the victim’s apartment, including photographs of the victim, who was found lying face down inside the apartment, with his feet closest to the doorway and holding the faceplate for the radio from his car; photographs of the victim’s car, showing that the faceplate for .the radio was missing; and | ^photographs of the stop sign and street light on the corner, which is about 90 feet from the apartment building. He testified that a spent bullet was found on the floor, by the hallway leading back toward , the bedroom area, but no shell casings were found.
Det. Jeffrey Dowdy of the Monroe Police Department testified as .to his involvement in the investigation of Green’s murder. Two 911 calls placed by Shronda Burks and Corey Tanzy were played for the jury. .
Dr. Frank Peretti, an expert in forensic pathology, testified regarding his autopsy of the victim, Green. The state presented the autopsy photographs depicting the gunshot wound to the victim’s head. Dr. Peretti stated that the bullet entered at the victim’s left forehead and exited at the back right side of his head and that there was evidence of stippling, indicating that the bullet was fired from a distance of four to six inches from the victim’s head.
Rebecca Morales testified that she lived in a house just around the corner from the Hilco Apartments. She stated that, on March 28, 2010, she was at her house with Kayla Bennett. Shortly after 10:00. p.m., while she and Bennett were outside smoking, she heard a gunshot and then saw a man jump over her fence and run through her backyard. The man was wearing .dark clothing and had a beanie in his hand. Morales and Bennett went inside and, after hearing sirens, went to the Hilco Apartment complex three times. She testified that the second time they.went to the apartments, they walked through an alleyway behind the apartment building. She was walking in front of Bennett; and, when she noticed that Bennett was not 11 (¡behind her, she turned around and saw that a black male had cornered Bennett against the building. The man was wear *12 ing a blue' shirt and shorts, had one hand in his pocket and was holding a shirt in his other hand. She identified Defendant as the man she saw in the alley. She stated that he had asked Bennett what happened, if she saw or heard anything and who killed the victim. She further stated that Bennett told Defendant to find out for himself, and then she and Bennett walked to the front of the apartments. As they were walking back to her house, they saw a man wearing dark clothing squatting down in the bushes. When they got home, she drove back to the apartments and told police that she had seen a man in the bushes. She stated that thereafter, on April 1, 2010, her house caught on fire. She believed the fire was related to her seeing the man in the alley. She had. done a TV interview about crime in the neighborhood the day before; however, the fire was determined to have been an accident. Within a few days, she saw a newspaper article with Defendant’s picture and recognized him as the man she had seen in the alley on the night of the murder. She called Det. Dowdy and later identified Defendant in a photographic lineup.
• 'Kayla Bennett testified that, on March 28, 2010, she was at Morales’s house when she heard a gunshot and saw a man, wearing dark clothing and a dark-colored beanie, jump over Morales’s fence and run through the backyard. She stated that, on their second walk to the apartment complex, a man pushed her up against the building and asked her if she had seen anything. The man was wearing a dark blue shirt and dark shorts and was messing with his pockets. She identified Defendant as the man she saw 117behind the apartment building. She further stated that, on their way back to Morales’s house, she saw a man in the bushes. She testified that, after she saw a picture of Defendant in the newspaper, she talked to Det. Dowdy and identified Defendant in a photographic lineup.
Corey Tanzy testified that, on March 28, 2010, he and his girlfriend, Fatima Wilson, arrived at the Hilco Apartments about ten minutes prior to the shooting. Wilson lived in the apartment directly above’ the victim’s apartment. Tanzy stated that, as they were going up the stairs, he observed a man wearing a black jacket and a black skullcap sitting on the staircase. The man was close to his size, 6'2", and had a Jamaican or Nigerian accent, but he did not see the man’s face. He testified that, after the shooting, he saw a man, who was smaller than Defendant, dressed in dark clothing, running toward Desiard Road (away from the stop sign at the corner). After he went downstairs and saw the victim lying on the floor, he called 911.
Shronda Burks testified that she lived next door to the victim at Hilco Apartments. On March 28, 2010, she was inside her apartment with her daughter when they heard a gunshot. Her daughter opened the door and told her that she saw a man dressed in black run toward Des-iard Road. She called 911. When she went outside, she saw a man standing by the stop sign under a light pole on the corner. She stated that the man was heavyset, bald, and was wearing a yellow or orange shirt that he was pulling up and then took off. That night, she went to the police station and talked to Det. Dowdy. Around 4:00 a.m., she identified Defendant in a photographic lineup as the man she saw under the light pole.
|1sSharrick Young, a close friend of the victim, testified that, two days before his death, at a fish fry, Green, acting worried, pulled her away and told her that he had a disagreement with Defendant. She stated that Green told her that Defendant believed he had set up Defendant to get busted by the police for drugs. Green said *13 that Defendant told him to “just tell me the truth, I know you did it.” She further -stated that Green told her that Defendant was trying to take his car, which she actually owned, but was being used by Green, claiming that Green owed him money.
Felisha Percy, who had previously dated the victim and had a child with him, testified that, in the days before his death, Green was acting, nervous and withdrawn. She stated that Green told her that Defendant was upset with him-and that they, had had a confrontation because Defendant believed Green had “snitched”, to the police about the drugs to get him in trouble.. She also stated that Green had a Jamaican accent. -
Defendant’s first witness was Fatima Wilson, Tanzy’s girlfriend, who lived in the apartment directly above the victim. She testified that; when she and Tanzy arrived at the apartment complex shortly before the shooting, there was a dark-skinned man sitting on the staircase. She did not remember any, other details, but stated that the dark-skinned man was not Defendant.
Wanda Payne,' Defendant’s private investigator, testified that she conducted interviews on behalf of Defendant and that Shronda Burks never mentioned anything about a man wearing a yellow shirt trying to pull it off.
| igLeskas Ellis, Defendant’s girlfriend, testified that she was with Defendant on the night of March 28, 2010. Defendant came to her house in Love Estates around 8:45 p.m. and played a game on her phone while she got ready to go to a club; then they dropped her children off at Shalan-thea Cooper’s house. After they picked up Brown in Presidential Estates, they arrived at Club Paradise in Delhi, Louisiana, around 11:45 p.m. When the club closed, they dropped Brown off, picked up her kids and returned to her house. She ad- ' mitted that she did not come forward with Defendant’s alibi until about a year and a half after Green’s murder. She further admitted that she had previously provided , an alibi for a different boyfriend who was also accused of murder in 2001.
Shalanthea Cooper testified that, on the night of March 28, 2010, Ellis asked if she could watch her children. She stated that, when Ellis dropped off her children, she saw Defendant in Ellis’s car.
Mr. Murray, Défendant’s previous attorney, testified that he and Defendant met with the state police in March 2010 and that the* topic of bail was discussed at that meeting.
Defendant testified ón his own behalf and admitted that he had pribr convictions for aggravated battery (for shooting a person), attempted possession of a firearm, illegal use of a dangerous weapon and simple battery (committed on Brown). He stated that he began selling drugs for Mock when he got out of jail in 2005, but that -he stopped selling drugs in 2009, when he started his own trucking business. He further stated that, on March 17, 2010, he asked Mock to get him a rental- car because he had | gnRicky’s ear and had lost the keys. When Ricky-told him that he would bring him án extra set of keys, Defendant told Mock he no longer needed the rental car. Later that night, around • 9:00 p.m., Defendant was at his girlfriend’s house in Love Estates with Green when Mock called and said he had the-rental car. He stated that he gave Green $200 to give to Mock and told Green to take Mock home and bring the car back, which Green did. He testified that, around 2:00 a.m., he met Ricky at the E-Z Mart. He pulled up next to Ricky and rolled down his window, and Ricky tossed him the car keys. He stated that he only rolled down- the window and did not- talk to Ricky because *14 he (Defendant) was on the phone with his .wife, Amy Freeman, telling her he was in Houston, Texas.
Defendant further testified that, after he was arrested, he believed Green had set him up, but later became suspicious of Mock. He stated that, when he saw Green a week before he died, he told Green that he knew it was Mock who had put the drugs in the car to set him, up. On the night of March 28, 2010,'when Green was killed, he went to Club Paradise 'in Delhi, Louisiana, with his girlfriend and Brown.
Following closing arguments, on March 19, 2014, the jury found Defendant guilty as charged on all eight counts. ' The verdict was unanimous on Counts Two through Seven and by a vote of 11-1 on Counts One and Eight.
On May 20, 2014, Defendant filed a motion for new trial, arguing that the trial court’s ruling allowing testimony regarding the victim’s remarks about him showed prejudicial error and that the ends of justice would be |⅞1 served by the granting of a new trial because defense counsel was unable to fully cross-examine two witnesses, Morales and Burks, who testified, while being extremely ill. On May 29, 2014, Defendant filed a motion for post-verdict judgment of acquittal, arguing that the evidence was insufficient for the jury to find him guilty. That same date, Defendant filed a pro' se motion for new trial, presenting arguments related to the motion to suppress.
At a hearing on May 29, 2014, the trial court denied all of the post-trial motions. Defendant was then sentenced as follows: Count One — life imprisonment at hard labor without benefits; Count Two — 10 years at hard labor, with the first two years to be served without benefits; Count Three — eight years at hard labor without benefits; Count Four — 25 years at hard labor; Count Five — 10 years at hard labor; Count Six — 15 years at hard labor; Count Seven — five years; Count Eight — five years. The court ordered that Counts Two, Three, Five, and Six are concurrent to Count Four; Counts Seven and Eight are concurrent with each other and consecutive to Count Four; and Count Four is consecutive to Count One.
The state filed a third-felony habitual offender bill of information; and, on August 8, 2014, the trial court adjudicated Defendant a third felony offender on Counts Two through Six and Eight. The trial court vacated Defendant’s sentences on Counts Two through Six and Eight,- and résentenced him to life imprisonment at hard labor without benefits on each of those counts. It stated that the sentences on Counts Two through Six and Eight would run concurrently with each other and concurrently with Count Four (which was consecutive to Count One). Defendant’s sentence of life ^imprisonment at hard labor on Count One and sentence of five years’ imprisonment on Count Seven remained unchanged. This appeal followed.

DISCUSSION

Denial of motion to suppress evidence . obtained from GPS

Defendant contends that the trial court erred in failing to suppress all evidence and testimony obtained through the war-rantless use of the GPS tracking device that was placed on the Ford Explorer. He claims that he has standing to challenge the use of the GPS device since Mock voluntarily gave possession of the car to him, he assumed possessory rights as the exclusive driver of the car and it is irrelevant whether he was listed on the rental agreement. He also claims that, under the Louisiana Constitution, he had a reasonable expectation of privacy because he law *15 fully obtained possession of the car and expected his location and movements to be private. He further contends that the state failed to show that Mock validly consented to the placement of the GPS on the car. Although Mr. Hardy, the owner of the local Hertz franchise, eventually testified that Hertz would allow renters to attach or use GPS devices as long as there was no permanent modification to the vehicle, Defendant argues, that Mr. Hardy originally testified that only the rental company could provide consent for a GPS device to be placed on the rental car. He also argues that Trp. Crooks never told Mock'he placed the GPS on the car and secretly placed it there while Sgt. Harwell distracted Mock. Defendant also argues that his right to privacy was violated based on the time and nature of the GPS monitoring since Trp. Jordan was giving a play-by-play of his location at all times.
12sThe state argues that Defendant does not have standing because he was not contractually or lawfully in possession of the rental car that was leased to Mock and delivered to him by Green. It claims that, under the Louisiana Constitution, Defendant had no reasonable expectation of privacy in the ’ rental car that he obtáined from someone other than the' lessee or authorized person. It also argues that there was no search because Mock consented to the placement of the GPS device while he was lawfully in possession of the rental car. It contends that, if there was a search, it was reasonable under the' circumstances as the GPS device was monitored for less than eight hours, monitoring commenced before Defendant possessed the car and monitoring only included the car’s location on public roads, not private property. It argues that no testimony of the GPS data was offered at trial to show Defendant’s movement, noting that, in United States v. Jones, supra, the Court ordered the suppression of only the GPS data gathered. It notes that, in the case before this court, the officers visually observed Defendant travel to -the E-Z Mart and watched the drug transaction and argues that, even though the GPS data informed the officers -that Defendant was approaching the E-Z Mart, they would have made the same observations and collected the same physical evidence without that data. For these reasons, the evidence seized would have been inevitably discovered without resort to the GPS tracking. Moreover, it claims that United States v. Jones, supra, was decided after the search in this case; and, under the good faith exception, the officers in the case at bar were entitled to rely on then-current precedent, specifically United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), to conduct the search in this case.
The right of every person- to be secure in his person, house, papers and effects' against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the 1974 Louisi- ’ aha Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is pér se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Tatum, 466 So.2d 29 (La.1985); State v. Ledford, 40,318 (La.App.2d Cir.10/28/05), 914 So.2d 1168.
■ La. C. Cr. P. art. 703 states that a defendant may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. When the constitutionality of a warrantless search or seizure is placed at *16 issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D); State v. Johnson, 32,384 (La. App.2d Cir.9/22/99), 748 So.2d 31.
In reviewing the correctness of the trial court’s pretrial ruling on a motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress and may review 1 gsthe entire record, including testimony at trial. State v. Monroe, 49,365 (La.App.2d Cir.11/19/14), 152 So.3d 1011.
 Great weight is placed upon the trial court’s ruling on a motion to suppress in regard to the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of then-testimony. Accordingly, this court reviews the trial court’s ruling on a motion to suppress under the manifest error standard for factual determinations, while ap- - plying a de novo review to its findings of law. State v. Monroe, supra.

Standing

In Louisiana, “[a]ny person adversely .affected by a search or seizure conducted in violation, of this Section shall have standing to raise its illegality in the appropriate court.” La. Const. Art. I, § ,5. Thus, ,“[t]here is no equivalent under Louisiana constitutional law to the federal j.;ule that one may not raise the violation-'of a third person’s constitutional rights.” State v.. Jackson, 09-1983 (La.7/6/10), 42 So.3d 368, citing State v. Owen, 453 So.2d 1202 (La.1984). However, La. Const. Art. I, § 5, presupposes that “there must be an invasion of someone’s rights to privacy before there can be an unreasonable search.” State v. Perry, 502 So.2d 543 (La.1986). The test of when that intrusion occurs as a matter of the Louisiana Constitution is identical to the Fourth Amendment standard, i.e., the person must possess an objectively reasonable expectation of privacy in the area. State v. Perry, supra. The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a | ?fitype which society at large is prepared to- recognize as being reasonable. State v. Jackson, supra.
In State v. Jackson, supra, the Louisiana Supreme Court addressed the expectations of privacy of drivers of rental vehicles:
In the present case, Officer Diel’s entry into the vehicle used in violation of the contract between Enterprise and the renter clearly did not violate any privacy rights of Enterprise as the owner of the vehicle with an interest in the legitimate use of its property within the limits of its agreement with the renter. With respect to the driver who had possession of the vehicle, no evidence was adduced at the suppression hearing as to the identity of the person who rented the vehicle from Enterprise or how the driver of the vehicle then came to possess it out of the renter’s presence, i.e., whether he did so with or without the renter’s permission. In the latter case, the driver would have had no more legitimate expectation of privacy in the vehicle than he would have in a stolen vehicle and defendant , as his passenger' would have no derivative right as a matter of La. Const, art. I, § 5 to assert a violation of those non-existent privacy interests.
As to the former ease, although a standard car -rental form provides that only the person renting the vehicle or another authorized person may use the vehicle, see United States v. Boruff, 909 *17 F.2d 111, 114 (5th Cir.1990), it is not uncommon for persons to rent cars for the benefit of someone else or consent to the use of a vehicle he or .she has rented. Even then, substantial authority exists that a person in possession and control of a car rented by someone else who has voluntarily delivered the vehicle to him for his own use has no standing to contest a search or seizure of the vehicle because he has no reasonable expectation of .privacy. See, e.g., United States v. Seeley, 331 F.3d 471, 472 (5th Cir. 2003)(when defendant acquired possession of vehicle rented by his friend for his benefit because he lacked an appropriate credit card, under an agreement specifically limiting use of the vehicle to the renter, or other authorized user, defendant “lacked standing to challenge the search of the rental car, as he (the sole occupant of the car) was not the renter or an authorized driver.”); United States v. Wellons, 32 F.3d 117, 119 (4th Cir.1994)(“Here, as the district court found, appellant, as an unauthorized driver of the rented car, had no legitimate privacy interest in the car and, therefore, the search of which he complains cannot have violated his Fourth Amendment rights.”); Boruff, 909 F.2d at 117 (driver of rental car had no legitimate expectation'of privacy in the vehicle when he was not listed as an authorized user on the rental agreement' although he had ‘permission of actual renter to drive the car as rental agreement prohibited use by an unauthorized driver and driver “was well aware of these restrictions when he took possession of the car and used it during the smuggling operation”); United States v. Obregon, 748 F.2d 1371, 1375 (1984)(driver of a. vehicle rented by someone else who delivered the. vehicle to him for his use “did not have a legitimate expectation of privacy in the car he was driving and therefore he did not have standing to .challenge the stop and later search of the car by the [police]”). Some contrary authority also exists. See. United States v. Muhammad, 58 F.3d 353, 355 (8th Cir.1995)(“Both parties agree that the defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy.”); United States v. Kye Soo Lee, 898 F.2d 1034, 1038 (5th Cir.1990) (“In the instant case [defendants] were operating the truck with [the renter’s] permission. Indeed, [the renter] gave [defendants] the keys to the truck and entrusted the vehicle and its contents to [defendants]. On such facts as these, we are not prepared to disturb the district court’s finding that [defendants] had standing to contest the search of the truck’s cargo hold.”).
42 So.3d at 372-373.
Thus, in State v. Jackson, supra, the Louisiana Supreme Court noted the split in federal authority as' to whether a driver who has permission from the renter to use the vehicle has a reasonable expectation of privacy. However, in that case, the inquiry ended there because the defense failed to provide any evidence that the driver had obtained .the, .permission of the actual renter to use the .vehicle out of the renter’s presence and thereby acquired a reasonable expectation.of privacy in the vehicle which the defendant, as his passenger, could assert. As such, the court stopped short of deciding if a reasonable expectation of privacy exists in a case where such permission is granted.
|asIn United States v. Jones, supra, the U.S, Supreme.Gourt held that the government’s installation of a GPS tracking device to a vehicle and its use of. that device to monitor the vehicle’s movements constitutes a “search” under the Fourth Amend *18 ment. The Court stated that the government had “physically occupied private property for the purpose of obtaining information.” The Court did not focus on whether .the defendant had a reasonable expectation of privacy in the object of the search. Instead, the Court focused on whether there ’ had been a common-law trespass, a “physical intrusion of a constitutionally protected area,” but stated that this test should be applied in addition to the reasonable expectation of privacy test. It should be noted that the Court excluded only the data contained on the GPS device; it did not address suppression - of other evidence obtained subsequent to, or as a result of, the GPS data garnered by authorities.
In United States v. Jones, supra, the Court declined to consider whether the defendant had standing to challenge the installation of the GPS device on the car. The Court noted that, although the vehicle in question was registered to the defendant’s wife, the government had conceded that the defendant was “the exclusive driver,” meaning that “he had at least the property rights of a bailee,” and that the defendant possessed the vehicle at the time the GPS device was installed.

.Exclusionary Rule

If evidence was derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. State v. Benjamin, 97-3065 (La.12/1/98), _ 722 So.2d 988. In State v. Brock, 47,005 (La.App.2d Cir.3/7/12), 91 So.3d 1003, writ denied, 12-0784 (La.9/28/12), 98 So.3d 826, this court stated that the exclusionary rule‘is designed to safeguard Fourth Amendment rights generally through its deterrent effect, citing Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). However, the fact that a search or arrest was unreasonable does not necessarily mean that the exclusionary rule applies. The exclusionary rule is not an individual right and applies only where it results in appreciable deterrence. In addition, the benefits of deterrence must outweigh the substantial social cost of letting guilty and possibly dangerous defendants go free. State v. Brock, supra.

Good Faith Exception

The United States Supreme Court has created a good faith exception to the exclusionary rule. In United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court held that evidence seized in a search pursuant to a warrant, which was invalid for lack of probable cause, need not be excluded at trial if the officers who conducted the search reasonably believed that the warrant was valid. The Court explained that the exclusionary rale “is designed to deter police misconduct rather than to punish the errors of judges and magistrates.”
In Davis v. United States, 564 U.S. 229, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), the U.S. Supreme Court extended the good faith exception and held that “searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.”
lanPrior to the decision in United States v. Jones, supra, the U.S. Supreme court addressed the government’s use of electronic tracking devices, specifically beepers, in United States v. Knotts, supra, and United States v. Karo, supra, validating the use of such technology.
In United States v. Knotts, supra, the U.S. Supreme Court held that the monitoring of a beeper that had been installed on a container with the consent of the then-owner and then placed in a vehicle, thereby allowing law enforcement to monitor its location, did not constitute a search in violation of the Fourth Amendment. The *19 court explained that “[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another,” and the beeper simply revealed what could have been seen by the public through visual surveillance and it made no difference that the officers’ “sensory faculties” were augmented by its use.
In United States v. Karo, supra, the U.S. Supreme Court found that the installation of a beeper in a container with the consent of the original owner did not violate the Fourth Amendment when the container was later delivered to a buyer who had no knowledge of the presence-of the beeper. The Court stated that, because the beeper was installed with the consent of the owner, the transfer of the container did not convey any information and did not invade the defendant’s privacy. Also, the Court stated that “[a]lthough the can may have contained an unknown and unwanted foreign object,” its placement in the container amounted at most to a “technical trespass” to the defendant’s possessory interest that was “only marginally | irrelevant to the question of whether the Fourth Amendment [had] been violated.”
Since United States v. Jones, supra, courts have applied the good faith exception in cases of warrantless GPS searches conducted pre-Jones and held that law enforcement could rely on Knotts, supra, and Karo, supra, as binding appellate precedent. See United States v. Aguiar, 737 F.3d 251 (2d Cir.2013), cert. denied, — U.S. -, 135 S.Ct. 400, 190 L.Ed.2d 290 (2014). United States v. Katzin, 769 F.3d 163 (3d Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 1448, 191 L.Ed.2d 403 (2015).

Inevitable Discovery Doctrine

In State v. McGraw, 43,778 (La.App.2d Cir.12/10/08), 1 So.3d 645, writ denied, 09-0317 (La.11/6/09), 21 So.3d 297, this court stated that, under the inevitable discovery doctrine, evidence found as a result of a violation of a defendant’s constitutional rights would be admissible if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered, citing Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine has been followed by Louisiana courts. State v. Lee, 05-2098 (La.1/16/08), 976 So.2d 109, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008).

Consent.

It is well settled that a warrant-less search conducted pursuant to valid consent is permitted by the Louisiana and United States Constitutions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Raheem, 464 So.2d 293 (La.1985). To be valid, consent must be (1) free and voluntary, in circumstances that indicate the consent was not the product of coercion, threat, promise, pressure or duress that would negate the voluntariness;- and (2) given by someone with apparent authority to grant consent, such that the police officer reasonably believes the person has the'authority to grant consent to search. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Howard, 49,965 (La.App.2d Cir.6/24/15), 169 So.3d 777.
A warrantless search may be valid even if consent was given by one without authority, if facts available to officers at the time of entry justified the officers’ reasonable, albeit erroneous, belief that the one consenting to the search had authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).
*20 The first issue in this case is whether Defendant had a reasonable expectation of privacy in the rental car, such that he has standing to challenge the installation and use of the GPS tracking device. Here, Defendant requested that Mock rent a car for him. Mock gave the car to Green, who then gave the car to Defendant, Although Defendant was not listed on the rental agreement, it appears that he had permission from the renter, Mock, to use the rental car. As recognized in State v. Jackson, supra, the federal circuits are split on the issue of whether a driver using a rental car with the permission of the renter has a reasonable expectation of privacy, and the Louisiana Supreme Court has not decided the issue. Arguably, Defendant did not have a. reasonable expectation of privacy in the | -^rental car because he was in collusion with Mock, with both of them knowing that the car was to. be used in criminal activity. Further, Defendant was not in possession of the rental car at the time the GPS device was installed, arid it appears that Mock consented to the placement of the GPS device on the car.
Assuming for purposes of this opinion only that Defendant has standing, we find that the trial court did not abuse its discretion in denying Defendant’s motion to suppress based on the use of the GPS tracking device. First, under the good faith exception to the exclusionary rule, the officers reasonably relied on United States v. Knotts, supra, and United States v. Karo, supra, as binding precedent. Prior .to United States v. Jones, supra, Knotts and Karo appeared to authorize the warrantless installation and monitoring of a GPS tracking device on a vehicle on public roads. Therefore, the good faith exception applies, and suppression is not warranted.
Second, in United States v. Jones, supra, the U.S. Supreme Court suppressed only the GPS data. However, in this case, no evidence or testimony regarding the GPS data was offered at trial. Further, the officers were physically stationed at and around the E-Z Mart and visually observed Defendant and the tanker truck travel to the E-Z Mart and the drug transaction. The officers testified that their plan was to stay at the E-Z Mart regardless of where the GPS indicated the car was located, and they used the GPS only so they would not have to follow Defendant and risk being seen. All of the evidence seized would inevitably have been discovered without preference to the GPS tracking data; therefore, we find that such evidence is admissible under the inevitable discovery doctrine. Accordingly, this assignment of error is without merit.

Lack of probable cause

Defendant "argues that the trial court erred in denyirig his motion to suppress since the officers did not have reasonable suspicion to stop his car. He states that the officers relied solely on unconfirmed and unreliable information from Mock, and Trp. Jordan testified that he never saw a hand-to-hand transaction between him and Ricky. He contends that, although the officers claimed he was stopped for speeding, Trp. Crooks testified that Trp. Lowery was instructed to establish probable cause and initiate a traffic stop, and Sgt. Harwell testified that it was predetermined that Trp. Lowery would stop his car after he left the E-Z Mart. Further, he claims that the officers’ search of the car did not fall within the automobile, plain view or inventory exceptions to the warrant requirement. As to the plain view exception, he contends that the narcotics were found in a closed, plastic, Walmart bag, and, therefore, were not in plain view. He claims that the officers could not have known what was in the bag without open *21 ing it because the bag was opaque, not transparent.
The state argues that the officers had probable cause and/or reasonáble suspicion to justify the initial attempt to stop Defendant’s car. The officers had significant intelligence of Defendant’s involvement in drug trafficking and were entitled to rely on the information provided to them by Mock, who was cooperating with them. The officers were aware that ^Defendant would be receiving drugs at the E-Z Mart via a tanker truck, and they personally visually observed him arrive at the E-Z Mart and make a transaction with the driver of the tanker truck. Also, when Defendant left the E-Z Mart, he was observed to be exceeding the posted speed limit when Trp. Lowery attempted to stop him. Defendant refused to stop and led the officer on a high-speed chase, ultimately wrecking and abandoning the car. It contends that all of this information permitted the officers to search Defendant’s car, pursuant to Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). Further, it argues that the officers observed the narcotics through the window of the car and were, therefore, entitled to seize such evidence under the plain view exception. It also claims that the officers were entitled to search the car because Defendant abandoned the car, with the lights on and the motor running.

Reasonable Suspicion

The right of law enforcement officers to stop and interrogate those reasonably suspected of engaging in criminal activity is recognized in La. C. Cr, P. art. 215.1, as well as by state and federal jurisprudence. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984).
For -a traffic stop to be justified at its inception,..an officer must have an objectively reasonable suspicion that some sort of legal violation, such as a traffic violation, occurred, or is about to occur before stopping the vehicle. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). When determining .whether an investigatory stop was justified by reasonable suspicion, a reviewing.court must consider the totality of the circumstances, giving deference to the inferences and, deductions of a trained police officer. State v. Huntley, 97-0965 (La.3/13/98), 708 So.2d 1048; State v. Sinclair, 46,623 (La.App.2d Cir.8/17/11), 72 So.3d 448. The determination of reasonable suspicion for an investigatory stop, or probable cause for arrest, does not rest on the officer’s subjective beliefs or attitudes,' but turns on a completely objective evaluation of all >the circumstances known to the officer at the time of the challenged action. State v. Landry, 98-0188 (La.1/20/99), 729 So.2d 1019; State v. Sinclair, supra. When an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable, regardless of the officer’s intent. Whren v. United States, supra.
The U.S.-.and Louisiana Supreme Courts ;have held that officers .may make an initial traffic stop after observing a traffic infraction even if the purpose of the stop is to investigate for CDS violations. State v. Franklin, 31,068 (La.App.2d Cir.9/23/98), 719 So.2d 578, writ denied, 98-2982 (La.3/19/99), 739, So.2d 781, citing Whren v. United States, supra, and State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879.

Exceptions to the Warrant Requirement

When a warrantless search is conducted, the state has the burden of showing the search was justified as an exception to the, warrant requirement of the Fourth Amendment. State v. Johnson, *22 supra. The exceptions to the warrant requirement that are pertinent to this inquiry are the plain view | ^doctrine and search of an automobile that is justified by probable cause, as well as the search of an abandoned automobile.

Plain View Exception

The plain view doctrine renders a warrantless search reasonable: (1) if the police officer is lawfully in the place from which he views the object; (2) where the object’s incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object. Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, writ denied, 06-2976 (La.3/9/07), 949 So.2d 441.

Abandoned Automobile

Under the automobile emergency exception to the search warrant requirement, a constitutional search of a vehicle may be made without a warrant (1) if there is probable cause to believe that the vehicle contains contraband or evidence of a crime, and (2) exigent circumstances require an immediate search. An abandoned automobile may be legally searched without a warrant. State v. Kelly, 576 So.2d 111 (La.App. 2d Cir.1991), writ denied, 580 So.2d 666 (La.1991). When property has been abandoned, a person’s property interest in it lapses, and there is no further reasonable expectation of privacy. As a consequence, the property may be searched and seized without the normally required warrant. State v. Kelly, supra.
The trial court did not abuse its discretion in denying Defendant’s motion to suppress. The evidence and testimony presented at the | .^suppression hearing and at trial establish that the initial stop, arrest, search and seizure were all proper. Regarding the initial stop, Trp. Lowery testified that he observed Defendant traveling 60 mph in a 55 mph zone. This observation provided him with the necessary reasonable suspicion to believe that a traffic violation had been committed, and he was justified in attempting to stop the vehicle for a traffic violation, even if the purpose of the stop was to investigate for CDS violations. However, rather than cooperating with Trp. Lowery’s signals to stop, Defendant refused to stop, leading Trp. Lowery on a chase and ultimately crashing into a tree. This provided Trp. Lowery with probable cause to arrest Defendant for flight from an officer. See La. R.S. 14:108.1.
Further, once Defendant was in custody, the officers walked by Defendant’s car and observed the narcotics in plain view on the passenger floorboard. Contrary to Defendant’s allegations that the narcotics were in a closed, plastic bag, the photographs show that the cocaine packages were sticking out of a blue plastic bag and the pills were in a clear bag and also scattered around the passenger floorboard. Therefore, the evidence was lawfully seized pursuant to the plain view exception. Further, after crashing the car, Defendant fled on foot, abandoning the car. As such, the officers were entitled to search Defendant’s abandoned car since he no longer had any expectation of privacy in it. Accordingly, this assignment of error is without merit.
la ¿Sufficiency of the Evidence
Defendant argues that the evidence presented at trial was insufficient to find him guilty of second degree murder. He contends that the state’s case was based entirely on its theory that he had motive to kill Green because he believed Green snitched on him regarding his alleged participation in drug activity. He *23 further argues that the state relied on unreliable and conflicting eyewitness testimony and notes that none of the witnesses identified him as the shooter. He claims that there were no fingerprints, DNA evidence or a gun found at the scene of the crime; and, thus, there was no physical evidence connecting him to Green’s murder. ,
The state argues that its theory is that Defendant and an as-of-yet unidentified second suspect murdered Green. It notes that Burks, Morales and Bennett identified Defendant as being'in the area around the apartment ’ complex after the shooting; that Young and Percy testified that Green was nervous in the days before his death after having a confrontation with Defendant; and that, after his initial drug arrest, Defendant was recorded on a phone call, during which he accused Green of being the snitch. It argues that the jury rejected Defendant’s outlandish claims and the alibi defense set forth by his girlfriend and believed the state’s witnesses based on the overwhelming evidence of his motive and guilt in this homicide..
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a .reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La. App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833; writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Carter, supra. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most -favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was- guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983). Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of |41the main fact may be inferred according'to reason and common experience. State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
 Where there is conflicting testimony about-factual matters, the resolution of which depends upon.a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its -sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the ab-; *24 sence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Dotie, supra.
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047; State v. Powell, 27,959 (La. App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. Positive identification by only one Lawitness is sufficient to support a conviction. State v. Hughes, supra; State v. Powell, supra.

Second Degree Murder

Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). .
Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, writ denied, 12-2667 (La.5/24/13), 116 So.3d 659. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Reed, 45,237 (La.App.2d Cir.5/26/10), 37 So.3d 1116. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Thornton, 47,598 (La.App.2d Cir.3/13/13), 111 So.3d 1130. Further, the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La. App.2d 14 Cir.9/22/04), 882 So.2d 731, writ denied, 04-2645 (La.2/18/05), 896 So.2d 30.
La. R.S. 14:24 provides that “all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.”
The evidence presented at trial was sufficient for the jury to find Defendant guilty of second degree murder. Defendant’s identity as the perpetrator is the only issue raised by the defense.
At trial, the state presented the eyewitness testimony of Burks, Morales and Bennett, who all positively identified' Defendant, in a photographic lineup and in court, as being in the area around the apartment complex immediately following the shooting.- Burks, who lived next door to the victim, testified that, after she heard the gunshot, she looked outside and saw Defendant standing under the light pole by the stop sign on the corner. Morales and Bennett testified that as they were walking to the apartment complex, Defendant stopped them in. the alleyway and asked if they had seen anything. Although positive *25 identification by only one witness is- sufficient to support a conviction, none of the witnesses identified Defendant as the shooter.
The' state presented additional circumstantial evidence implicating Defendant’s involvement in the murder. While Defendant was in jail on the drug charges, he called a friend and accused- the victim, Green, of providing | .^information - to the police regarding Defendant’s drug activity. Also, Young and Percy testified that, several days before his murder, Green was acting nervous because he had a confrontation with Defendant and told them that Defendant had accused him of being the snitch.
Defendant challenged the credibility of the state’s witnesses and relied on the alibi testimony provided by his girlfriend. -He also argued that there was no physical evidence definitively linking him to Green’s murder.
' After hearing all of the evidence, the jury chose to believe the testimony of the state’s witnesses and rejected Defendant’s alibi defense. This court does not assess the credibility of-witnesses or reweigh evidence. Considering the evidence in a-light most favorable to the prosecution, we find that the state sufficiently negated any reasonable likelihood of misidentification and that the jury reasonably found that Defendant was the perpetrator of, or a principal to, the second degree murder of Green. Accordingly, this assignment of error is without merit.

CONCLUSION

For the foregoing reasons, the convictions and sentences of Defendant Dveil D'eshon Freeman are affirmed.
AFFIRMED.

. After the defendant left the E-Z Mart parking lot, Trp. Jordan, Sgt. Harwell and Sheriff Philley apprehended Ricky,