637 So.2d 522 (1993)
Lawrence FALKOWSKI and Carolyn Falkowski
v.
Joseph L. MAURUS, The City of Baton Rouge/Parish of East Baton Rouge Through the Department of Emergency Medical Services, and the St. Paul Fire and Marine Insurance Company.
No. CA 92 0102.
Court of Appeal of Louisiana, First Circuit.
September 9, 1993.
*523 Ralph L. Fletcher, Baton Rouge, for plaintiffs-appellants Lawrence Falkowski, et ux.
Errol J. King, Baton Rouge, for intervenor-appellant Community Health Network of La., Inc.
Myron A. Walker, Jr., Baton Rouge, for defendants-appellees Joseph Maurus, Clifton Malone, City of Baton Rouge EBRP, Dept. of Emergency Medical Services, St. Paul Fire and Marine Ins.
Before EDWARDS, SHORTESS and WHIPPLE, JJ.
*524 WHIPPLE, Judge.
This appeal concerns the res nova issue of the definition of gross negligence as contained in LSA-R.S. 40:1235 et seq. and its applicability under the facts presented herein. Plaintiffs, Lawrence and Carolyn Falkowski, and intervenor, Community Health Network of Louisiana, Inc., appeal the judgment of the lower court in favor of defendants, Joseph Maurus; Clifton Malone;[1] the City of Baton Rouge/Parish of East Baton Rouge through the Department of Emergency Medical Services (EMS); and the St. Paul Fire and Marine Insurance Company. The judgment dismissed with prejudice the action of plaintiffs and intervenor. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Lawrence Falkowski was diagnosed with diabetes in January of 1988. In the early evening of August 30, 1988, Dr. Falkowski suffered an episode of hypoglycemia, or low blood sugar, while sitting at a desk in his office at Louisiana State University. Dr. Falkowski's wife, Carolyn Falkowski, discovered her husband in his office in a sleep-like state and called 911 for emergency assistance.
At approximately 5:30 p.m., emergency medical technicians (EMTs) Joseph Maurus and Clifton Malone arrived on the scene. At the time of this incident, Maurus was an EMT paramedic, and Malone was an EMT intermediate.[2] After learning that Dr. Falkowski was diabetic, the EMTs determined that his blood sugar level was 40, which was "profoundly low" and that he was responsive only to pain stimuli, a potentially life-threatening situation.
Maurus then contacted Our Lady of the Lake Hospital to obtain authority to initiate a hypoglycemia protocol. Dr. Joseph Allain, the emergency room physician on duty that evening, authorized Maurus and Malone to proceed with the established protocol for hypoglycemic patients. Dr. Allain's authorization was not given directly, but was relayed to EMT Maurus through a nurse on duty at the hospital.[3]
While Maurus was obtaining authorization to initiate the hypoglycemia protocol, Malone searched for a viable vein to initiate a venipuncture. As an EMT intermediate, one of Malone's primary functions was initiating IVs. Malone related that he had difficulty locating a suitable site to initiate an IV on Dr. Falkowski, who weighed approximately 320 pounds at the time of the incident. Malone placed a tourniquet on Dr. Falkowski's right arm, but did not see any viable veins in the antecubital fossa (the inner portion of the bended elbow). Malone then searched the left arm for a viable vein, but "saw nothing there that [he] wanted to try." Malone then went back to the right arm because he had seen a vein in the wrist area that he thought could be suitable. Malone testified he then told Maurus the vein in the right wrist was the only vein he could locate.
According to Malone and Maurus, after receiving authorization to initiate the hypoglycemia protocol, an IV was established in Dr. Falkowski's right wrist, palm side up on the ulnar nerve side. Dr. Falkowski was then given two amps of Dextrose-50, which were injected into one of the IV ports. Following the administration of the Dextrose-50, Dr. Falkowski gradually regained consciousness and at some point complained of pain at the IV site and inability to use his right hand. Dr. Falkowski testified that upon regaining consciousness, he immediately noticed swelling in the area of the IV site. Maurus eventually discontinued the IV because of Dr. Falkowski's complaints.
Dr. Falkowski was transported to Our Lady of the Lake Hospital where he was *525 examined by Dr. Allain. Dr. Allain testified that he did not recall any swelling or blistering at the site of the IV or anything unusual about Dr. Falkowski's situation at the time he arrived at the hospital.[4] According to Dr. Allain, Dr. Falkowski was alert and able to respond to questions appropriately. Dr. Falkowski testified that he complained of numbness and loss of use of his hand, but was told that these problems were temporary. Dr. Falkowski was sent home later that evening.
The pain and swelling in Dr. Falkowski's right arm increased during the night until his entire arm from the shoulder to the fingertips was double its size by the next morning. Dr. Falkowski also had no feeling or motion in the right hand. Later that day, Dr. Falkowski was examined by Dr. Ted Kemp, the partner of Dr. David Ramey, the Falkowskis' family physician. After examining Dr. Falkowski, Dr. Kemp thought that Dr. Falkowski had possibly developed a deep venous thrombosis in the subclavian area (or blood clot in a deep vein in the area right under the collarbone) as well as thrombophlebitis (an inflammation or infection in the vein and surrounding skin). Dr. Kemp admitted Dr. Falkowski to Our Lady of the Lake Hospital.
Dr. Ramey, a specialist in internal medicine, took over Dr. Falkowski's care on the day after Dr. Kemp admitted him to the hospital. Dr. Ramey released Dr. Falkowski from the hospital on September 2, 1988, having ruled out deep venous thrombosis. Based on the numbness present in the last two fingers of the right hand, Dr. Ramey concluded Dr. Falkowski had probably sustained infiltration of the Dextrose-50, a hypertonic solution which can be extremely damaging to tissues and which had been administered to him during the hypoglycemic attack two days before, on August 30, 1988.
Dr. Falkowski was eventually treated by Dr. David Kline, a neurosurgeon and chairman of the Department of Neurosurgery at LSU Medical Center, upon referral by Dr. Steven Zuckerman, the neurologist who obtained nerve conduction studies. Dr. Kline determined that Dr. Falkowski was suffering from complete distal ulnar palsy, meaning that all the functions of the ulnar nerve from the wrist down were absent. On March 15, 1989, Dr. Kline performed surgery on Dr. Falkowski, removing the non-functioning segment of the ulnar nerve and replacing it with segments of sural nerve harvested from Dr. Falkowski's leg.
Dr. Kline saw Dr. Falkowski post-operatively on April 14, 1989 and September 11, 1989, at which times his ulnar palsy was unchanged. Dr. Kline explained that regrowth of the nerve, if any occurs, is a process that takes four or five years, and opined that Dr. Falkowski had a fifty percent chance of making a significant recovery over the next several years.
At trial, held on March 25 and 26, 1991, Dr. Falkowski testified that the surgery performed by Dr. Kline had produced no effect on his right hand in terms of function although the pain and swelling were reduced to some degree. Dr. Falkowski stated that he still experiences pain and periodic swelling in his right hand. As of the time of the trial, he had not regained use of the right hand and suffered loss of use of the muscles of the thumb.
Following trial on the merits, the trial court concluded in oral reasons for judgment that the procedure employed by the EMTs in injecting the Dextrose-50 caused the damage to Dr. Falkowski's ulnar nerve. The court then considered the statutory immunity granted by LSA-R.S. 40:1235, which grants immunity from civil liability to emergency medical technicians, parish governing authorities and their insurers, among others, for any acts or omissions in rendering emergency medical care when the EMTs are in the performance of medical duties and under the instructions of a physician, unless the acts or omissions were intentionally designed to harm or were grossly negligent. LSA-R.S. 40:1235.
The court concluded there was no gross negligence on the part of the emergency services team in setting up the IV in Dr. Falkowski's wrist or in administering the Dextrose-50. The court then dismissed *526 plaintiffs' and intervenor's actions against defendants.
Plaintiffs and intervenor appeal. Plaintiffs assign the following as error:
1. The trial court erred in finding that the defendants were entitled to the statutory immunity granted by LSA-R.S. 40:1235.
2. The trial court erred by using the wrong standard of gross negligence in this civil damages case.
3. The trial court erred in holding that plaintiff, Lawrence Falkowski, failed to prove that the defendant EMS attendants were grossly negligent.
4. The trial court erred in failing to award monetary damages to plaintiffs, Lawrence Falkowski and Carolyn Falkowski.
Intervenor adopted plaintiffs' first three assignments of error and stated its fourth assignment as follows:
4. The trial court erred in failing to award reimbursement to Community Health Network for medical expenses paid on behalf of the plaintiff, Lawrence Falkowski.

STATUTORY MEANING OF "FOLLOWING THE INSTRUCTIONS OF A PHYSICIAN"

(Assignment of Error No. 1)
Plaintiffs and intervenor contend that the trial court erred in finding that the defendants were entitled to the statutory immunity granted by LSA-R.S. 40:1235.
LSA-R.S. 40:1235 provides in pertinent part:
A. (1) Any basic, intermediate, or paramedic emergency medical technicians certified pursuant to the terms of this Part who render emergency medical care to a person while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such a person for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such person....
(2) The immunity granted herein to basic, intermediate, and paramedic emergency medical technicians by the provisions of this Part shall extend to parish governing authorities, police departments, sheriffs' offices, fire departments, or other public agencies engaged in rendering emergency medical services and its insurers with respect to such emergency medical services unless the emergency medical technician employed by said agencies would be personally liable under the provisions of Paragraph (1).
Plaintiffs and intervenor assert that Maurus and Malone were not "following the instructions of a physician" within the meaning of this statute when they initiated the hypoglycemia protocol. Appellants contend that obtaining permission to initiate the hypoglycemia protocol from Dr. Allain through a nurse is not the equivalent of following the instructions of a physician within the meaning of the statute.
Benjamin Giovingo, assistant training director for the Department of Emergency Medical Services for East Baton Rouge Parish, explained at trial that a protocol is a set of medical orders for life-threatening situations that EMTs encounter on a routine basis, as established by the Department of Emergency Medical Services, approved by the parish medical society, and distributed to hospitals and individual EMTs. Thus, when a doctor authorizes a protocol, the doctor is in fact authorizing the EMTs to take all steps necessary to accomplish the procedures listed in the protocol, and the doctor knows exactly what procedures the EMTs will perform and the order in which they will be performed.
Maurus similarly testified that a protocol is a set of instructions which sets out the parameters for what should be done in a given situation. Maurus explained that EMTs cannot proceed with any invasive procedure, such as initiating an IV, without first obtaining authorization for the protocol from a physician.
*527 Dr. Allain testified that when a patient suffers from a condition for which a protocol exists, the EMTs contact the hospital and relay information about the patient's situation to the physician on duty. If the physician agrees with the assessment of the EMTs that a certain protocol should be initiated, the physician then authorizes the protocol. Dr. Allain explained that implicit in the authorization is the authority to take all appropriate actions to effectuate the procedures listed.
In this case, it is clear that Dr. Allain authorized Malone and Maurus to initiate the hypoglycemia protocol, which involves the establishment of an IV line of Dextrose-5W and the administration of Dextrose-50. While Dr. Allain did not speak directly with Malone or Maurus, his authorization to initiate the hypoglycemia protocol was relayed to the EMTs through a nurse on duty at the hospital.
Plaintiffs and intervenor note that Dr. Allain did not instruct the EMTs on how to establish the IV, where to start the IV, or how to administer the Dextrose-50. However, as the testimony shows, when a physician authorizes a protocol, he does so relying on the fact that the EMTs are certified to perform the procedures listed. Maurus was certified at the paramedic level at the time of this incident, and Malone was certified at the intermediate level. These certifications mean that both were trained and certified to initiate IVs and that Maurus, as an EMT paramedic, was authorized to administer Dextrose-50.
The testimony establishes that protocols are simply lists of medical instructions previously prepared which must be authorized by a physician before being initiated in the field. We find no merit in appellants' arguments on this issue and conclude, as did the trial court, that Malone and Maurus were "following the instructions of a physician" as contemplated by the statute when they initiated the hypoglycemia protocol.
Thus, this assignment of error lacks merit.

DEFINITION OF "GROSS NEGLIGENCE"

(Assignment of Error No. 2)
Plaintiffs and intervenor contend the trial court erred, as shown in its oral reasons for judgment, in defining "gross negligence" as willful, wanton or reckless negligence, a standard which appellants argue is beyond gross negligence.[5]
We are cognizant that the enactment of LSA-R.S. 40:1235 et seq. is a recognition by the legislature that there are strong public policy reasons for affording partial immunity from civil damages to emergency medical services technicians in the performance of their duties. Indeed, as the lay and expert testimony in this record clearly shows, the performance of medical services in the field under emergency circumstances is indisputably more difficult than in a properly equipped, pristine emergency room. Recognizing the difficulty which a certified EMT may face in the performance of his or her duties, the legislature enacted LSA-R.S. 40:1235 which grants partial immunity to EMTs under certain circumstances.
The immunity granted in LSA-R.S. 40:1235 does not extend to "acts or omissions intentionally designed to harm" or "grossly negligent acts or omissions which result in harm."
In this case, the trial judge carefully considered the issue of defendants' liability and explained his understanding of the term "gross negligence" in oral reasons for judgment as follows: "I find the best definition, at least in my mind, with gross negligence is more of a wilfull [sic], wanton or reckless negligence and extreme departure from ordinary care." The trial court then concluded "there was no gross negligence, no wilfull [sic] and wanton reckless disregard, no extreme going below the ordinary care of a similarly situated EMTs person."
*528 In their brief to this court, appellants contend that the trial court defined gross negligence as "wilfull, wanton or reckless negligence" and contend this is a "criminal standard for gross negligence ... [which] goes beyond a civil standard of gross negligence."
Our research reveals a complete absence of Louisiana civil cases defining gross negligence. Traditionally, gross negligence has been defined as an extreme departure from ordinary care or the want of even scant care. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence § 8(4)(a), at 539-540 (1966 & Supp.1993). However, the terms "willful," "wanton" and "reckless" have been incorporated into this definition by courts.
As stated by Prosser:
Lying between intent to do harm, which... includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi-intent." To this area the words "willful," "wanton," or "reckless," are customarily applied; and sometimes, in a single sentence, all three. Although efforts have been made to distinguish them, in practice such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit.
* * * * * *
The result is that "willful," "wanton," or "reckless" conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. As a result there is often no clear distinction at all between such conduct and "gross" negligence, and the two have tended to merge and take on the same meaning, of an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care.
Prosser and Keeton, supra, at 212, 214 (footnotes omitted).
Clearly, there is no fixed definition for what constitutes gross negligence. However, we find the trial court's definition was in accord with the above cited authorities and thus, is legally correct. Accordingly, we find no merit in appellants' contention that the lower court improperly defined "gross negligence."
Thus, this assignment of error lacks merit.

"GROSS NEGLIGENCE" UNDER THE FACTS OF THIS CASE

(Assignment of Error No. 3)
Appellants further contend that the trial court erred in failing to find that EMTs Maurus and Malone were grossly negligent under the facts of this case.
The determination of gross negligence must be made based on a consideration of the facts and circumstances of each case. 65 C.J.S. Negligence § 8(4)(a), at 541. In the instant case, it is apparent from the record that the trial court carefully considered all of the evidence and testimony before concluding that plaintiffs had failed to establish that the individual defendants were grossly negligent in the conduct of their duties. As the trial court stated, "[i]n making a determination of gross negligence [,] all of the relevant circumstances surrounding the particular incident must be considered...."
The finding of negligence is a factual finding, and appellate courts will not disturb such findings in the absence of a showing of manifest error. Booty v. Kentwood Manor Nursing Home, Inc., 483 So.2d 634, 639 (La.App. 1st Cir.1985), writ denied, 486 So.2d 754 (La.1986).
At trial, extensive lay and expert testimony was presented. Both Maurus and Malone testified similarly as to the events surrounding the establishment of the IV in Dr. Falkowski's wrist and the administration of the Dextrose-50. The site used was the right wrist, palm side up on the ulnar nerve side. According to Maurus and Malone, Malone prepped the wrist area where he had located a viable vein and inserted an eighteen-gauge catheter needle assembly into the vein. Upon inserting the needle, Malone received *529 an immediate flashback of blood into the flashback chamber, indicating that the needle had entered the vein. Malone then slid the catheter into the vein and extracted the needle.
Malone then connected the IV tubing, released the tourniquet and opened the flow of the IV. Malone testified that he observed the IV for a period of time to make certain that no swelling (or bleeding) developed. Malone did not recall seeing any swelling, and stated that the IV was flowing in a constant stream, both of which were indications that the fluid was flowing into a vein.
Moreover, both Maurus and Malone related that Malone lowered the IV fluid bag below the level of the heart, at which time the IV flow stopped and blood backed up into the tubing, another indication that the IV was properly situated in a vein.
Satisfied that the IV had been properly initiated, Maurus then proceeded to slowly "push" one amp of Dextrose-50 through one of the IV ports. However, Dr. Falkowski gave very little response after the first amp of Dextrose-50 had been administered and thus, Maurus then proceeded to push another amp of Dextrose-50. After the second amp was administered, Dr. Falkowski finally regained consciousness.
Both Maurus and Malone testified that they did not recall observing any swelling or blebbing at the site of the IV during the administration of the Dextrose-50. Malone testified that if the Dextrose-50 had been pushed into interstitial tissue rather than a vein, a bleb the size of a lemon or larger would have immediately developed in Dr. Falkowski's wrist.
Maurus related that after he had pushed both amps of Dextrose-50, he noticed that two fingers on Dr. Falkowski's right hand had turned up, and shortly thereafter, Maurus observed some minor redness and puffiness, akin to a "decent mosquito bite." Maurus discontinued the IV because of Dr. Falkowski's complaints of pain and inability to use his right hand.
Dr. Allain, the emergency room physician who examined Dr. Falkowski that evening, testified that he did not recall any swelling or blistering at the site of the IV when Dr. Falkowski arrived at the hospital. Furthermore, he testified that assuming an IV of Dextrose-5W had been started, that the EMTs had received a return of blood in the flashback chamber, that the bag was lowered below the level of the heart and produced a return, that a good flow of the solution through the system was maintained the entire time, and that there was no instantaneous swelling at the site of the IV, his opinion would be that the IV was handled appropriately. Dr. Allain stated that when administering intravenous solutions, infiltration occurs "not infrequently," and happens even in the performance of all appropriate conduct.
Regarding the location chosen by the EMTs to initiate the IV, Dr. Allain opined that if a viable vein exists in the wrist, and is the only one that can be found, an injection of Dextrose-50 at that location would be appropriate.
Dr. Ramey stated that he also "did not have a problem" with the site chosen to initiate the IV. However, he opined that assuming gross negligence is defined as "a very great negligence, the absence of slight diligence or the want of even scant care," the EMTs were grossly negligent in administering the Dextrose-50.
Dr. Ramey admitted that in the process of initiating venipunctures, nerves are struck with needles "all the time," and opined that there is no negligence in merely striking a nerve. However, Dr. Ramey stated that the EMTs should have continually or repeatedly aspirated, by pulling back on the syringe to get a blood return, during the administration of the Dextrose-50 to ensure that the solution was flowing into the vein. He also stated that since it is much harder to push the fluid into surrounding tissue rather than a vein, the EMT pushing the Dextrose should have realized it was not entering the vein. Accordingly, Dr. Ramey concluded that the EMTs acted in a grossly negligent manner.
However, Dr. Sarah D'Autremont, an emergency physician and medical director of the emergency department at Baton Rouge General Hospital, testified in direct contradiction to Dr. Ramey's opinion concerning *530 the need and value of repeated aspiration. Dr. D'Autremont testified that in the course of her practice in emergency medicine, she has never interrupted the pushing of Dextrose-50, a life-saving medication, to aspirate throughout administration. She further stated that she had never seen it done and had never heard of it being done.
Dr. D'Autremont explained that when pushing Dextrose-50, the primary indicator that the fluid is escaping the vein is swelling of tissue around the vein. Dr. D'Autremont stated that with an amp of Dextrose-50 being pushed into a patient's interstitial tissues, even in an obese wrist, there would be an immediate large bleb approximate in size to a lemon.
After reviewing the EMTs "run report," the depositions of Dr. Falkowski and Maurus, and the medical reports and depositions of Drs. Ramey, Zuckerman, Morgan, and Kline, Dr. D'Autremont opined that the EMTs had acted in an appropriate manner under extremely difficult conditions. Dr. D'Autremont testified concerning her experience in performing IVs in the field under emergency situations and noted that it is without a doubt more difficult to initiate an IV in the field than in an emergency room. Dr. D'Autremont opined that the EMTs had exercised due care and had, in fact, saved Dr. Falkowski's life.
Dr. Zuckerman, the neurologist who conducted nerve conduction studies on Dr. Falkowski, testified regarding the site chosen by the EMTs to initiate an IV. Dr. Zuckerman recognized that while the palm side up on the ulnar side of the wrist is not a usual location for IV initiation, it is appropriate if this site presents the only vein available.
When questioned on the issue of whether the EMTs were negligent in the establishment of the IV or the administration of Dextrose-50, Dr. Zuckerman refused to give an opinion, stating that negligence was a legal term. However, Dr. Zuckerman did state that he believed that there seemed to be something improper about the EMTs' medical technique to have caused damage to the ulnar nerve. Dr. Zuckerman agreed that despite all proper technique, perforations in the vein can occur; however, he testified that regardless of how the Dextrose-50 had escaped the vein, he would conclude that there was an improper medical technique, or the ulnar nerve would not have been damaged.[6]
Dr. Morgan, the orthopedic surgeon who surgically released Dr. Falkowski's ulnar and median nerves in the right wrist, testified that nerves are routinely penetrated by injections, which in his opinion is not negligent. However, he gave no opinion regarding negligence in the administration of Dextrose-50 in this case.
Dr. Kline, a specialist in peripheral nerve injuries, testified by deposition that he has seen over 200 nerve injuries from injections either through material being injected directly into a nerve or through the nerve being bathed in the IV material which has escaped from the vein.
Dr. Kline opined from his observations during the surgery on Dr. Falkowski's ulnar nerve, that some Dextrose-50 had been inadvertently put into the nerve or close enough to it to damage the nerve. However, he stated that he does not think that either striking a nerve, a frequent occurrence, or injecting a solution so as to impair the function of that nerve necessarily constitutes negligence on the part of the venipuncturist. Dr. Kline explained that this is something which occurs in venipunctures, and in most cases, he does not believe that anyone has done anything wrong.
Dr. Kline noted that the hypoglycemic episode presented a life and death situation, and concluded the EMTs acted appropriately under the circumstances. Thus, Dr. Kline did not believe that the actions of the EMTs constituted negligence under the circumstances presented on August 30, 1988.
A court of appeal may not set aside finding of fact by the lower court in the absence of manifest error or unless it is clearly wrong. The decision to accept or *531 reject, in whole or in part, the testimony of an expert is for the trier of fact. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990).
After carefully reviewing the medical evidence and lay and expert opinions presented herein, and considering the record in its entirety, we are unable to state that the trial court was clearly wrong in concluding that Maurus and Malone did not act in a grossly negligent manner.
Accordingly, this assignment of error lacks merit.

FAILURE TO AWARD DAMAGES AND REIMBURSEMENT TO INTERVENOR

(Appellants' and Intervenor's Assignment of Error No. 4)
Dr. and Mrs. Falkowski contend the trial court erred in failing to award monetary damages. Similarly, intervenor contends the trial court erred in failing to award reimbursement for medical expenses paid on behalf of Dr. Falkowski. Since we find no error by the court below on the issue of liability, we pretermit the issue of damages.

CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court in favor of defendants, Joseph Maurus, Clifton Malone, the City of Baton Rouge/Parish of East Baton Rouge, and the St. Paul Fire and Marine Insurance Company dismissing with prejudice the demands of plaintiffs, Lawrence and Carolyn Falkowski, and intervenor, Community Health Network of Louisiana, Inc. Costs of this appeal are assessed equally between plaintiffs and intervenor.
AFFIRMED.
NOTES
[1] By amendment to their original petition, the plaintiffs named Clifton Malone as a defendant.
[2] There are three classifications of emergency medical technicians: basic, intermediate and paramedic. The EMT basic is trained and certified in basic skills such as first aid and splinting. An EMT intermediate is certified to perform additional skills such as intravenous infusions. An EMT paramedic, which is the most advanced classification, is certified to perform electrocardiogram monitoring and to administer drugs.
[3] The hypoglycemia protocol involves the establishment of an IV line of Dextrose-5W and the administration of a 50 percent dextrose in water solution (Dextrose-50).
[4] The emergency room records were not made a part of the record.
[5] An appeal is taken from a final judgment, not from reasons for judgment which are the trial court's explanations of determinations made. However, it is not improper for the court of appeal to consider written reasons for judgment in determining whether the trial court erred. State in the Interest of Mason, 356 So.2d 530 (La.App. 1st Cir.1977).
[6] Dr. Zuckerman was not asked nor did he render an opinion as to whether the EMTs were "grossly negligent."