# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1096


**BRENNA ASH MILLER, ET AL**

**VERSUS**

**ACADIAN AMBULANCE SERVICE, INC., ET AL**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20126808
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy H. Ezell, and Candyce G. Perret, Judges.


**AFFIRMED.**

**Robert J. David**
**Walter C. Morison, IV**
**Kathy A. Rito**
**Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.**
**1100 Poydras St., Suite 2800**
**New Orleans, LA 70163-2800**
**(504) 522-2304**
**COUNSEL FOR PLAINTIFFS-APPELLANTS:**
    **Brenna Ash Miller**
    **Brenna Ash Miller on behalf of the Estate of Richard A. Miller, Jr.**
    **Brenna Ash Miller as legal guardian of minor Skylar Miller**

**Clint L. Pierson**
**Pierson Law Firm**
**5100 Village Walk, Suite 101**
**Covington, LA 70433**
**(985) 809-1577**
**COUNSEL FOR PLAINTIFFS-APPELLANTS:**
    **Brenna Ash Miller**
    **Brenna Ash Miller on behalf of Estate of Richard A. Miller, Jr.**
    **Brenna Ash Miller as legal guardian of minor Skylar Miller**

**Charles J. Foret**
**Jason R. Garrot**
**Briney Foret & Corry, LLP**
**413 Travis Street, Suite 200**
**P. O. Drawer 51367**
**Lafayette, LA 70505-1367**
**(337) 237-4070**
**COUNSEL FOR DEFENDANT-APPELLEE:**
    **Northshore EMS, L.L.C.**

**PERRET, Judge.**

Brenna Ash Miller, individually, as the duly appointed guardian of the minor child, Skyler Miller, and as the individual authorized to make the claim on behalf of the estate of Richard A. Miller, Jr., appeals the judgment of the trial court that granted summary judgment in favor of defendant, Northshore EMS, L.L.C., and dismissed her lawsuit against it with prejudice. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY:**

In this court's prior opinion, *Miller v. Acadian Ambulance Service, Inc.,* 13-1269, pp. 1-5 (La.App. 3 Cir. 3/5/14) 134 So.3d 250, 252-254, (footnote omitted) *writ denied*, 14-698 (La. 5/16/14), 139 So.3d 1028, this court recited the facts and procedural history, as follows:

> On December 28, 2011, Richard A. Miller, Jr. ("Mr. Miller") was involved in a serious motorcycle accident in Washington Parish. The Northside [Northshore] Emergency Medical Service ("Northshore") responded to a 911 call and transported Mr. Miller to the Riverside Medical Center ("Riverside") where he was attended to by Dr. Barbara Cohn and other Riverside Emergency Room personnel.
>
> Dr. Cohn determined that Mr. Miller's condition was critical. As a result of the accident, he had sustained extensive internal injuries, which included lacerations of the lung, heart, and kidney, extensive blood loss, multiple fractures, and a flail chest, which is a crushing chest injury due to the fracture of several ribs.
>
> In Dr. Cohn's opinion, Mr. Miller's critical medical condition required her to contact LERN [Louisiana Emergency Response Network], as Riverside did not have the necessary level of medical resources to properly treat Mr. Miller's injuries. Dr. Cohn's call to LERN was the first step in initiating the procedure to have Mr. Miller transported to a trauma facility equipped to treat Mr. Miller's extensive injuries.

LERN was designed to serve as the clearing house for all of the resources of each medical facility and to determine which facility is best equipped to treat a particular patient's condition. The LERN dispatch center is staffed with a trained paramedic who receives the incoming calls, and based on the information provided from the transferring health care provider, LERN makes a determination as to the appropriate trauma facility to treat the injured patient.

The LERN dispatcher informed Dr. Cohn that Mr. Miller should be transferred to Interim LSU [Interim LSU Public Hospital]. A call was then placed by a member of the Riverside staff at 5:36 p.m. to Acadian [Acadian Ambulance Service, Inc.] to request that a helicopter be dispatched to Riverside in order to transport Mr. Miller to Interim LSU.

The recorded telephone conversation between Riverside and Acadian reflects that Riverside was informed that due to a required crew change and the need for refueling of its helicopter, it would be an hour to an hour and fifteen minutes before Acadian could respond and arrive at Riverside to transport Mr. Miller. The Riverside staff member indicated to the Acadian dispatcher that if this period of time was not acceptable to Dr. Cohn, he would call back. No call canceling the helicopter transportation of Mr. Miller was received, and the Acadian helicopter arrived at Riverside at 7:08 p.m., some seventeen minutes after the anticipated arrival time.

Once the determination by LERN was made to transport Mr. Miller to Interim LSU, Dr. Cohn began the testing on Mr. Miller required by Interim LSU prior to his transport by Acadian. Upon arrival at Riverside, Acadian was not permitted to immediately transport Mr. Miller as the testing required by Interim LSU was not complete. Once the testing was completed, Mr. Miller was cleared for transport at 7:40 p.m., thirty-two minutes after Acadian's arrival at Riverside.

Mr. Miller was taken to the aircraft by Riverside personnel and Acadian's EMT/paramedic Kimberly Wesley ("Wesley"). Mr. Miller was loaded and secured for takeoff. Wesley provided constant critical care monitoring and medical treatment throughout the transport, which included placing Mr. Miller on a ventilator and suctioning his chest tube. Mr. Miller's condition rapidly declined right before the helicopter landed in New Orleans near the Superdome, as Interim

LSU did not have a helicopter landing pad and the Superdome site was the closest landing pad to Interim LSU.

Mr. Miller was then transported by ambulance to Interim LSU, with the ambulance staff continuing to attempt to maintain Mr. Miller's medical status. Mr. Miller unfortunately died at approximately the same time as his arrival at Interim LSU at approximately 8:12 p.m.

On December 27, 2012, the Millers timely filed a medical malpractice complaint with the Division of Administration and the Louisiana Patient's Compensation Fund, naming Interim LSU, LERN, and Acadian . . . .

On December 27, 2012, the Millers also filed a petition for damages in the Fifteenth Judicial District Court, Parish of Lafayette naming LERN and Acadian as defendants. The Millers' "First Supplemental and Amending Petition for Damages," filed on April 2, 2013, added three other health care providers as defendants, Interim LSU, Northside EMS, LLC, Barbara Cohn, M.D., and her insurer, Proassurance Specialty Insurance Company ("Proassurance").

All health care provider defendants, except Northside, filed dilatory exceptions of prematurity in response to the Millers' petitions. Each asserted they were qualified health care providers pursuant to the LMMA [Louisiana Medical Malpractice Act], La.R.S. 40:1299.39 & 40:1299.41. As qualified health care providers under the LMMA, providing medical care to Mr. Miller, each claimed to be entitled to have the Millers' claims dismissed without prejudice pending review and notification of an opinion by the MRP [Medical Review Panel], pursuant to La.R.S. 40:1299.47(A)(2)(a) & (B)(1)(a)(i). In granting the health care provider defendants' exceptions, the exceptors assert that the Millers would not be prejudiced, as under the LMMA prescription is suspended in state district court until the MRP sends notification of its opinion, following which the Millers would have ninety days to file suit in state district court.

A hearing was held on the health care defendants' exception of prematurity on July 22, 2013. At the beginning of the hearing, the dilatory exception of prematurity filed by Dr. Barbara Cohn and her insurer, Proassurance, was granted by the trial court without opposition, and the Millers' claims as to these defendants

3

were dismissed without prejudice in a separate judgment signed by the trial court on July 22, 2013. The dismissal of Dr. Cohn and her insurer is not subject to this appeal.

The hearing on Acadian, LERN, and Interim LSU's exceptions of prematurity continued with oral argument, after which the trial court took the matter under advisement. The trial court issued its written reasons for judgment on July 26, 2013, and granted the exceptions of prematurity dismissing the Millers' claims without prejudice for the three remaining health care provider defendants, Acadian, LERN, and Interim LSU. A judgment reflecting the trial court's ruling was signed on August 15, 2013, and is the source of the Millers' timely appeal to this court.

On March 5, 2014, this court affirmed the trial court's judgment that granted exceptions of prematurity filed on behalf of Acadian, LERN, and Interim LSU, dismissing without prejudice the claims of Brenna Ash Miller, individually and as the duly appointed guardian of the minor child Skyler Miller, and the individual authorized to make the claim on behalf of the estate of Richard A. Miller, Jr., (collectively "Plaintiff") pursuant to the LMMA.

Thereafter, the only claims that remained in this litigation were those against defendant Northshore. Plaintiff alleges that Northshore was negligent in its treatment of Mr. Miller by transporting him to Riverside instead of a trauma center, in failing to train its employees of proper protocols, and that it breached its agreement with LERN.

On June 22, 2017, Northshore filed a motion for summary judgment alleging that there were no genuine issues of material fact, and as a matter of law, Northshore has no liability to Plaintiff for the alleged damages.

In support of its motion for summary judgment, Northshore attached: (1) the affidavit of the Northshore paramedic, Ashley Harper ("Ms. Harper"); (2) certified medical records from Riverside pertaining to Mr. Miller; (3) the deposition of Dr.

Cohn; (4) the deposition of David Marcus, on behalf of Northshore; (5) the corporate deposition of LERN; (6) certified medical records from Interim LSU pertaining to Mr. Miller; (7) Mr. Miller's autopsy report; and (8) the affidavit of Dr. Joseph Holley, Jr.

On July 21, 2017, Plaintiff filed an opposition to the motion for summary judgment alleging that issues exist as to whether Northshore is entitled to civil immunity under La.R.S. 40:1133.13, and that even if La.R.S. 40:1133.13 is applicable, material issues of fact exist as to whether Northshore, through "the actions of its paramedic, Ms. Harper, was grossly negligent in providing emergency medical services to the decedent, Richard Miller." Plaintiff argues that Ms. Harper did not follow proper protocol and "unilaterally decided to bring Mr. Miller to the local emergency department at Riverside Medical Center because of his 'shortness of breath' and 'vital signs.'"

In support of her opposition, Plaintiff attached: (1) medical records from Northshore; (2) the deposition and affidavit of Ms. Harper; (3) the deposition of Dr. Cohn; (4) excerpts of David Marcus's deposition, on behalf of Northshore; (5) portions of the LERN deposition and a copy of the LERN protocol guidelines; (6) answers to interrogatories; (7) the affidavits of Roy D. Ary, Jr., and Dr. Carl J. Hauser; and (8) a copy of the Washington Parish Major Trauma Destination Protocol.

On July 25, 2017, Northshore filed a supplemental memorandum in support of its motion for summary judgment arguing that Plaintiff's opposition, with exhibits, was untimely filed pursuant to the provisions of La.Code Civ.P. art. 966.

On July 26, 2017, Plaintiff filed an ex parte motion to continue the hearing on the motion for summary judgment stating that "Ms. Miller inadvertently filed

5

her opposition to summary judgment on July 21, 2017, less than fifteen days before the hearing on this motion, set for July 31, 2017." Plaintiff requested that the trial court continue the hearing in order to provide "both parties a fair opportunity to present their arguments on the issue of liability, and [that a continuance] does not impact any other procedural deadline established by the court."

Also on that date, Northshore filed objections to and a motion to strike the affidavits of Dr. Carl Hauser and Dr. Roy Ary arguing that the affidavits were untimely and that the opinions of these doctors "concerning Northshore's breach of the standard of care for paramedics are not admissible because the doctors are not qualified to render such opinions."

After a hearing on July 31, 2017, the trial court denied Plaintiff's motion for a continuance, granted Northshore's objection to Plaintiff's exhibits and its motion to strike affidavits, and granted Northshore's motion for summary judgment, dismissing Plaintiff's case with prejudice. On August 9, 2017, the trial court signed a judgment that memorialized its ruling and further stated "[in] so ruling, the Court finds it would have ruled the same way even if plaintiff's exhibits and affidavits in opposition to the summary judgment were admitted into evidence." At the hearing, the trial court gave reasons for granting the summary judgment and stated, in pertinent part:

> Even if I were to consider your affidavits of your expert[,] it wouldn't change the fact that there appears to be no liability on the part of the EMT. She had to fight with this patient for approximately nine minutes in the ambulance trying to keep his airway clean. He was pulling things out -- pulling oxygen off of his face and pulling IVs out of his arms. Most of the time he was with a doctor and the doctor didn't see fit to transfer him -- I believe in this case we're talking about to a New Orleans hospital from Washington, Louisiana. So I don't see how that would have made a difference. But they

were filed too late, anyway, and I'm not going to allow them.

Plaintiff now appeals this judgment alleging the following five assignments of error: (1) the trial court erred in finding that La.R.S. 40:1133.13 provides Northshore statutory immunity against her negligence claims; (2) the trial court erred in granting summary judgment in finding that Northshore's paramedic met the standard of care in providing emergency trauma treatment to Mr. Miller; (3) the trial court erred in granting summary judgment based upon its impermissible credibility determinations, weighing of evidence, and findings of fact to conclude that summary judgment was appropriate; (4) the trial court erred in granting summary judgment in finding no genuine issues of material fact existed that Northshore was grossly negligent in providing emergency trauma treatment to Mr. Miller; and (5) the trial court abused its discretion in denying her motion to continue the hearing, despite the fact that her opposition to the motion for summary judgment was filed five days late.

**STANDARD OF REVIEW:**

An appellate court reviews a trial court's granting of a motion for summary judgment de novo. *Duncan v. U.S.A.A. Ins. Co.*, 06-363 (La. 11/29/06), 950 So.2d 544. Under this standard of review, the appellate court uses the same criteria as the trial court in determining if summary judgment is appropriate: whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. *Id.* "A fact is 'material' when its existence or nonexistence may be essential to [a] plaintiff's cause of action under the applicable theory of recovery." *Smith v. Our Lady of the Lake Hosp., Inc.,* 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute."

7

*Id.* (*quoting S. La. Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writs denied*, 596 So.2d 211 (La.1992)).

Louisiana Code of Civil Procedure Article 966(D)(1) discusses the mover's burden of proof on summary judgments, and states:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

**DISCUSSION:**

The first issue to address is whether the trial court erred in denying Plaintiff's motion to continue the hearing on summary judgment and in striking her evidence in support of the opposition to summary judgment. Although Plaintiff admits that her opposition and exhibits were not timely filed, she "offered to cure the prejudice by agreeing to reset the hearing to a date of NSEMS' [Northshore's] own choosing, thus providing it ample time to reply to the opposition."

Louisiana Code of Civil Procedure Article 1601 provides that "[a] continuance may be granted in any case if there is good ground therefor." Under La.Code Civ.P. art. 1602, a continuance must be granted if "the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance." The court in *Suarez v. Acosta*, 15-750, pp. 9-10 (La.App. 5 Cir. 3/16/16), 194 So.3d

8

626, 632 (citations omitted) discussed the trial court's discretion in granting or denying a continuance and stated in pertinent part:

> In determining whether to grant a continuance, the trial court must consider the particular facts in each case. Some factors to consider are diligence, good faith, and reasonable grounds. The trial court may also weigh the condition of the court docket, fairness to the parties and other litigants before the court, and the need for orderly and prompt administration of justice. A trial court has great discretion in granting or denying a motion for a continuance under La. C.C.P. art. 1601, and that discretion will not be disturbed on appeal in the absence of clear abuse of discretion.

In this case, Plaintiff did not allege any peremptory grounds for a continuance. Upon review of the record, and the fact that Northshore has been a defendant in this case since February 13, 2013, we do not find that the trial court abused its broad discretion in denying Plaintiff's motion for a continuance. Because we find no error in the trial court's ruling that denied the motion to continue, we also find that the opposition and exhibits were untimely as they were filed on July 21, 2017, which was ten days prior to the July 31, 2017 hearing, in violation of La.Code Civ.P. art. 966(B)(2). As stated in La.Code Civ.P. art. 966(B)(2) (emphasis added):

> B. Unless extended by the court and agreed to by all of the parties, a motion for summary judgment shall be filed, opposed, or replied to in accordance with the following provisions:
>
> (1) A motion for summary judgment and all documents in support of the motion shall be filed and served on all parties in accordance with Article 1313 not less than sixty-five days prior to the trial.
>
> (2) **Any opposition to the motion and all documents in support of the opposition shall be filed and served in accordance with Article 1313 not less**

**than fifteen days prior to the hearing
on the motion**.

Thus, "[t] he time limitation established by La. C.C.P. art. 966(B) for the serving of affidavits in opposition to a motion for summary judgment is mandatory; affidavits not timely filed can be ruled inadmissible and properly excluded by the trial court." *Buggage v. Volks Constructors*, 06-175 p. 1 (La. 5/5/06), 928 So.2d 536, 536. Accordingly, we find that the trial court did not abuse its discretion when it followed the mandatory fifteen day rule and properly excluded Plaintiff's opposition and exhibits as untimely.

The second issue to address is whether the trial court erred in granting Northshore's motion for summary judgment and dismissing Plaintiff's suit against it with prejudice. On December 10, 2015, Plaintiff alleged the following negligence claims against Northshore in its Fourth Supplemental and Amending Petition, which states, in pertinent part:

66.
Had Northshore EMS properly and timely trained its employees on how and when to activate LERN, when it became a part of the LERN network on November 11, 2010, Ms. Harper and Mr. Holcomb would have known to utilize the LERN network in order to obtain medical care for Mr. Miller at the appropriate trauma facility.

67.
Petitioner avers that Northshore EMS was negligent in its failure to train and educate its employees on the availability and use of the LERN response network for treating and transporting patients with traumatic injuries.

68.
Petitioner avers that Northshore EMS' failure to train its employees to activate the LERN response network whenever a patient with traumatic injuries is encountered constituted a breach of[:] (1) its obligations to adhere to its own promulgated patient care protocols; (2) its duties to adhere to applicable written pre-hospital

EMS protocols . . . and/or[;] (3) its duties to provide patients with appropriate care . . . .

69.

Petitioner further avers that Northshore EMS' negligence in its failure to adhere to its internal protocols, as well as its applicable duties under the law, was a direct, proximate cause of the injuries Mr. Miller suffered in this case, including loss of chance of a better outcome, as well as those injuries and damages sustained by Ms. Miller and Skylar, the minor child.

70.

Additionally, Northshore EMS' failure to appropriately train its employees regarding their duty to initiate the LERN response network when providing pre-hospital services to a trauma patient constitutes a tortious breach [of] its contract with LERN and/or its agreement to provide appropriate emergency responses services to Mr. Miller.

Louisiana jurisprudence employs a duty-risk analysis to resolve ordinary negligence claims under La.Civ.Code art. 2315. *Berthiaume v. Gros*, 15-116, (La.App. 3 Cir. 6/3/15), 165 So.3d 1275. To prevail under a negligence claim, the plaintiff must prove five elements: "1) that the defendant had a duty to conform his conduct to a specific standard of care; 2) that the defendant failed to do so; 3) that the substandard conduct was a cause-in-fact of the plaintiff's injuries; 4) that the conduct was a legal cause of the plaintiff's injuries; and 5) actual damages." *Id.* at 1278. The Louisiana Supreme Court in *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095, p. 8 (La. 3/10/06), 923 So.2d 627, 633 stated that "[t]he duty of a paramedic can be broadly defined as the duty to render appropriate medical care based on the facts and circumstances of the medical situation with which they are presented."

Louisiana Revised Statute 40:1133.13, formerly cited as La.R.S. 40:1233, also addresses the legal duties that emergency medical technicians owe to patients, and states in pertinent part:

11

A. (1) Any emergency medical services practitioner, licensed pursuant to the provisions of this Part who renders emergency medical care to an individual while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such an individual for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such an individual. Nothing herein shall relieve the driver of the emergency vehicle from liability arising from the operation or use of such vehicle.

By enacting La.R.S. 40:1133.13, "the Legislature granted EMTs a qualified immunity for liability from ordinary negligence claims; this immunity does not cover intentional or grossly negligent acts or omissions." *Rathey v. Priority EMS, Inc.*, 04-0199 p. 32 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 462, *writs denied*, 05-0789 (La. 5/6/05), 901 So.2d 1107; 05-0802 (La. 5/6/05), 901 So.2d 1108. The Legislature "conditioned this immunity by limiting its application to circumstances in which EMTs are both (i) rendering emergency medical care to an individual while in the performance of their medical duties, and (ii) following the instructions of a physician." *Id*. at 461. However, there is a "protocol" exception to the requirement that the EMT be following the instructions of a physician. As the court stated in *Rathey*, 894 So.2d at 462:

Legally, the trial court's reference to a "protocol" exception to the requirement that the EMT be following the instructions of a physician is based on well-settled jurisprudence. Discussing that exception (although not calling it an exception), we recently noted that "[i]n *Ambrose* [*v. New Orleans Police Dep't Ambulance Serv*., 93-3099, 93-3110, 93-3112 (La. 7/4/94), 639 So.2d 216] ... this court held that an emergency room technician was considered to have been following the instructions of a physician, pursuant to R.S. 40:1235(A), whether he had received those instructions via electronic means or he was following a 'protocol,' defined as a prescribed set of instructions established by physicians of the Orleans Parish Medical Society." *Johnson v. Foti*, 2002-1995, p.

12

5 (La.App. 4 Cir. 4/9/03), 844 So.2d 1050, 1054. Likewise, another court defined "protocol" in this context to mean "a set of medical orders for life-threatening situations that EMTs encounter on a routine basis, as established by the Department of Emergency Medical Services, approved by the parish medical society, and distributed to hospitals and individual EMTs." *Falkowski v. Maurus*, 637 So.2d 522, 526 (La.App. 1 Cir. 1993).

Although Plaintiff argues that the trial court erred in finding that La.R.S. 40:1133.13 provided Northshore statutory immunity, we see nothing in the judgment or in the hearing transcript whereby the trial court noted which standard of care it used in granting the summary judgment. However, even under an ordinary negligence standard, Plaintiff must prove that Ms. Harper breached the standard of care applicable to paramedics when she transported Mr. Miller to Riverside without first calling LERN. Therefore, we will examine the pleadings, depositions, affidavits, and medical records filed in support of the motion and make a de novo determination as to whether material facts remain and whether Northshore is entitled to summary judgment as a matter of law.

In its memorandum in support of the motion for summary judgment, Northshore explained the services it provides in Washington Parish, Louisiana, and its agreement with LERN, as follows (footnotes omitted):

> Washington Parish is the geographical boundary for Northshore. Northshore does not have helicopters to provide air med transport. Each ambulance is staffed with an EMT basic and a paramedic. Northshore provides advanced life support services and nonemergency care.
>
> An EMT basic must pass courses required by the State of Louisiana and the national curriculum. They are able to perform advanced first aid, CPR, oxygen administration, and some basic airway maneuvers. Paramedics are trained to do everything an EMT basic can do, but are also trained to perform endotracheal intubation, and to administer cardiac drugs and pain

medications. Northshore's paramedics are trained to assess the patient at the scene, and on the trauma protocols. Northshore paramedics have the discretion to deviate from the protocols if they feel the patient is deteriorating.

. . . .

At the time of the accident involving Mr. Miller, Northshore was a participating pre-hospital provider in the Louisiana Emergency Response Network ("LERN"). The participation agreement between Northshore and LERN states:

When people are in need of time-sensitive medical care and treatment as a result of trauma or other emergencies or disasters, Participating Pre-Hospital Provider (Northshore) and LERN, acting through the LERN Call Center ["LCC"] **will use best efforts** to facilitate the movement of patients following LERN Entry Criteria and Destination Protocols (the "Protocols"), to the extent these protocols are applicable to a particular situation . . . . (Emphasis added)

The LERN protocols were drafted and approved by the LERN board, which includes a physician medical director.

Attachment A to the participation agreement is the LERN Entry Criteria which lists the triage protocol of when LERN should be contacted. The LERN Destination Protocol attached to the Agreement provides that when there is a medical emergency involving a patient with an unmanageable pathway, the patient should be transported to the closest emergency department for intervention. The reason for this is because the patient will need rapid sequence intubation and the hospital has this capability. Northshore paramedic, Ashley Harper, was trained by Northshore on the LERN Entry Criteria and Destination protocols.

Ms. Harper's affidavit stated that she obtained a National EMS Certification as a paramedic by the National Registry of Emergency Medical Technicians in 2005. That same year, she became a licensed paramedic in Louisiana and began working for Northshore as a paramedic. Ms. Harper's affidavit stated that she and

14

EMT basic, David "Forrest" Holcomb, arrived on the scene of the accident involving Mr. Miller at 3:39 p.m. on December 28, 2011, and she explained her treatment of Mr. Miller, as follows, in pertinent part:

8.

Mr. Miller's chief complaint was shortness of breath and right-sided back pain. His vital signs were assessed at the scene. His pulse was 133, he had low blood pressure of 100/50, his respiratory rate was elevated at 36, and his SaO2 [oxygen saturation] was low at 69%. I observed he had an abrasion to his chest." I observed his skin was pale, cold, and clammy. These are signs of shock. My clinical impression was motor vehicle accident, short of breath, and right sided back pain.

9.

At the scene we gave him oxygen, immobilized his spine, and put him on a spine board. We also started an IV of normal saline infusion, performed a blood glucose check, and connected him to the cardiac/EKG monitor. The EKG showed he had sinus tachycardia, which is an elevated heartrate.

10.

We left the scene at 15:51 [3:51 pm]. I was concerned Mr. Miller had life threatening internal injuries compromising his ability to breathe. I made the decision to transport him to Riverside due to his poor vital signs and shortness of breath. Based on my evaluation of him and his vital signs, he needed immediate intervention at an emergency department to prevent an unmanageable airway. He needed intubation to maintain an open airway and to provide oxygen to his lungs. Because he was conscious, intubation could have only been performed at a hospital. I chose to transport him to Riverside because it was the hospital with the closest emergency department where he could be intubated and stabilized.

11.

Based on my observations and treatment of Mr. Miller, he appeared to be in a lot of pain and was highly agitated. His agitation was likely due to his shortness of breath and not remembering what happened. During the trip to Riverside he was constantly moving his arms and trying to remove the IV and oxygen. During the trip I repeatedly tried to calm him down and had to hold his

15

arms down and straight to prevent the IV from corning out and to prevent him from harming himself by removing his IV and oxygen. Due to these circumstances, I did not have time to place a call to LERN.

12.
We arrived at Riverside at approximately 16:00 [4:00 p.m.]. The trip from the accident scene to the hospital was approximately 6.8 miles.

13.
The services, treatment, and procedures provided to Richard Miller by Northshore were at all times consistent with the national EMS education standards and were consistent with my training and education as a paramedic.

The deposition of Chris Hector, the administrative director of LERN, stated that he is a medic who supervises and oversees the LERN communication center. He testified to the procedures used by EMTs when responding to an emergency and stated, in pertinent part:

EMS providers in the field arrive at the scene of an incident and they assess their patient and the accident. They determine if that patient or the mechanism by which the accident occurred meets the criteria as defined in the participation agreement. If the patient does meet one of those criteria, they would contact the communication center and then the communication center would direct them to the closest appropriate facility based on what's relayed in that report, what the patient's needs may be.

When discussing the LERN Entry Criteria and the Pre-Hospital and Hospital Triage Protocol, Mr. Hector testified as follows:

Each box is basically its own category. So you have the top box is [and its] what's considered an unstable patient and goes to the closest appropriate -- or the closest hospital: unmanageable airway; tension pneumo[thorax]; traumatic cardiac arrest; burn patient without patent airway; burn patient with greater than 40 percent body surface area without IV.

. . . .

16

> The top box refers to the closest hospital because these patients are considered unstable and they're going there for immediate emergent stabilization type care.

Mr. Hector repeatedly stated in his deposition that once a medic determines that a patient has an unmanageable airway, then the proper destination protocol is for the medic to go to the closest emergency department in order to stabilize the patient. Mr. Hector also stated in his deposition that the paramedic is not required to make a phone call to LERN when a patient has an unmanageable airway because the paramedic's first concern is treating the patient.

The deposition of David Marcus, the corporate representative for Northshore, stated that he provides training to EMTs, from the first responders to the paramedics. Mr. Marcus testified that starting in 2010, Northshore mandated that all EMTs and paramedics be trained on the LERN protocols and that he has continually updated the information when the policy changed. He testified that a paramedic has the sole discretion in determining where a patient needs to go for treatment. Mr. Marcus testified as follows:

> So we base -- from what we see on the scene, what the patient tells us, what our signs and symptoms are, based on all the criteria that are built into the protocols – abdominal trauma, head trauma, chest pain, arm pain, whatever that is. That's how we base the course of treatment and how -- where this patient needs to go.
> . . . .
>
> You follow the guidelines that the protocols are, but we [paramedic's] have that ability or that discretion to deviate from some of the protocols if we feel that the patient is deteriorating . . . .

When asked whether a paramedic should still call LERN when a patient has an unmanageable airway, Mr. Marcus testified:

> If we have time. There are times when we're in the back of that ambulance, we got a critical patient; it's hard to try to save your [patient's] life and be -- you

know, be on the phone at the same time. Sometimes that's where that little deviation comes in. I'm not saying it's right; I'm not saying it's wrong. But a lot of times, if I'm dealing with a severe bleeder or I'm having to do chest compressions on this person, I don't have time to sit and wait because I'm usually the only one in the back of the truck.

. . . .

Sometimes we do follow up [calls to LERN] afterwards. You know, take them to the closest facility because I know I'm in a bind. I don't have all the tools that I need in the back of the ambulance. I can take them to the closest facility, get the initial stabilization, and then we can activate LERN and say, "Look, I had to do this," and then we go from there.

When asked whether it is proper protocol for a paramedic to request the EMT basic to make that phone call to LERN, Mr. Marcus testified that it is not proper protocol and that "we try not to do it. There are times when we, you know, have tried a partner to call, and it still ends up being a mess." Mr. Marcus further testified that poor cellular service is another reason why a paramedic may not call LERN. As stated by Mr. Marcus, "Sometimes I have been on the phone five to ten minutes trying to give a report . . . . And a lot of times, it's just continuously repeating what I [the paramedic] just told them."

The deposition of Dr. Cohn stated that she was the emergency room physician at Riverside on the date of Mr. Miller's accident. When asked what type of medical services Mr. Miller needed upon his arrival, she responded:

He [Mr. Miller] needed a trauma service. He needed a blood bank with at least ten units of 0 negative and the ability to type and cross a patient for type-specific and patient-specific blood in less than an hour. He needed the capability for mass transfusion, he need[ed] anesthesia services[.] . . .

He was not stable.

18

When asked whether she contemplated sending Mr. Miller by ground ambulance to another facility, Dr. Cohn testified that "[e]xactly at that time, the dynamics of the patient, how the patient looked, . . . I still think that this patient required air ambulance, and, ah, I think that ground ambulance was inappropriate."

Further, when Dr. Cohn was asked the reasons for the forty-five minute delay in having her nurse notify LERN upon Mr. Miller arriving at Riverside, she responded, in pertinent part:

> Patient needed to be assessed. His airway was in question. He was intubated. Multiple units of blood were hung. There was an episode where the patient -- I put down an NG tube. Then the patient vomited. . . . The patient had catheters placed in him. Uhm, a primary and secondary survey were -- were performed. Orders were written. Patient then became quite agitated. I was holding him down while somebody got medication for him.

In support of its motion for summary judgment, Northshore also included an affidavit of Dr. Joseph Holley, an expert in the field of emergency medical services. After reviewing the Participation Agreement between Northshore and LERN, the LERN Entry Criteria and Destination Protocols, and Northshore's EMS' Protocols Manual, Dr. Holley testified that:

> It is my opinion Ashley Harper did not violate the standard of care applicable to paramedics. Her treatment of Mr. Miller was in accordance with the National EMS Education Standards. Since Mr. Miller had an unmanageable airway and needed intubation, as well as aggressive resuscitation interventions, all while attempting to prevent him from further harming himself, it is my opinion [that] Ms. Harper followed the LERN destination protocol and Northshore's Protocol Manual when she transported Mr. Miller to Riverside Medical Center, which was the closest hospital with an emergency department. Under these circumstances, Ms. Harper did not have time to call LERN. This is supported by the fact it took Dr. Cohn and her staff at Riverside 45 minutes to call LERN after receiving Mr. Miller as a patient and attempting to stabilize him.

19

The evidence attached to Northshore's motion for summary judgment is the only evidence we may consider in our review. After a review of the evidence submitted with Northshore's motion for summary judgment, we find that Northshore established that Mr. Miller had an airway emergency that required Ms. Harper to transport him to Riverside, which was the closest hospital with an emergency department. The evidence established that Ms. Harper followed Northshore and LERN's protocols for when a patient has an unmanageable airway and properly transported him to Riverside. Accordingly, even under an ordinary standard of negligence, we find that Plaintiff failed to prove that Northshore, through its paramedic, breached the standard of care required by paramedics while treating Mr. Miller.

For the reasons set forth herein, we affirm the trial court's grant of summary judgment in favor of defendant, Northshore EMS, LLC. Costs of the appeal are assessed to the plaintiff, Brenna Ash Miller, individually, as the duly appointed guardian of the minor child, Skyler Miller, and the individual authorized to make the claim on behalf of the estate of Richard A. Miller, Jr.

**AFFIRMED.**